768 N.W.2d 903 (2009)
2009 WI 91
Richard BUBB and Marjorie Bubb, Plaintiffs-Appellants-Petitioners,
v.
William BRUSKY, MD, Saint Agnes Hospital, Xian Feng Gu, MD, Lakeside Neurocare Limited and Medical Protective Co., Defendants-Respondents,
West Bend Company, Subrogated Defendant.
No. 2007AP619.
Supreme Court of Wisconsin.
Argued March 5, 2009.
Decided July 24, 2009.
*904 For the plaintiffs-appellants-petitioners there were briefs by John L. Cates, Heath P. Straka, Susan M. Kurien, and Gingras, Cates & Luebke, S.C., Madison, and oral argument by Heath P. Straka.
For the defendants-respondents, William Brusky, M.D. and Medical Protective Company, by Paul H. Grimstad, Ryan R. Graff, and Nash, Spindler, Grimstad & McCracken, Manitowoc, and oral argument by Paul H. Grimstad.
An amicus curiae brief was filed by Michael B. Van Sicklen, Bree Grossi Wilde, and Foley & Lardner LLP, Madison, on *905 behalf of Physicians Insurance Company of Wisconsin, Inc.
An amicus curiae brief was filed by Lynn R. Laufenberg and Laufenberg & Hoefle, S.C., Milwaukee, on behalf of the Wisconsin Association for Justice.
¶ 1 DAVID T. PROSSER, J.
This is a review of a published decision of the court of appeals, Bubb v. Brusky, 2008 WI App 104, 313 Wis.2d 187, 756 N.W.2d 584, which affirmed the decision of the Fond du Lac County Circuit Court, Robert J. Wirtz, Judge, to dismiss Richard and Marjorie Bubb's informed consent claim under Wis. Stat. § 448.30 (2007-08).[1]
¶ 2 The respondents state the issue as follows: "Did the evidence presented at trial establish an informed consent claim [under Wis. Stat. § 448.30] against Dr. Brusky?" The petitioners ask whether "the trial court commit[ted] reversible error by precluding the jury from considering [their] informed consent claim?"
¶ 3 We conclude that Wis. Stat. § 448.30 requires any physician who treats a patient to inform the patient about the availability of all alternate, viable medical modes of treatment, including diagnosis, as well as the benefits and risks of such treatments. The statute contains several reasonable exceptions to this requirement that limit the treating physician's duty to inform under the statute. In this medical malpractice action, the plaintiffs filed a separate and distinct claim grounded in the requirements of § 448.30. They presented sufficient evidence at trial to support such a claim. None of the statutory exceptions apply. Hence, the circuit court's dismissal of the claim at the conclusion of trial evidence was error.
¶ 4 We reverse the decision of the court of appeals and remand the case to the circuit court for further proceedings consistent with this opinion.

I. FACTS AND PROCEDURAL HISTORY
¶ 5 On October 24, 2001, Marjorie and Richard Bubb were eating dinner together when Marjorie noticed that Richard was having difficulty ingesting his food. "I asked him what was wrong, if he was okay," Marjorie said, "and he said he was." But he wasn't. When Richard fell out of his chair, Marjorie suspected that Richard was having a stroke. She immediately called for help from a neighbor and then called an ambulance, which transported Richard to the emergency department of St. Agnes Hospital in Fond du Lac.
¶ 6 After arriving at St. Agnes, Richard was examined by Dr. William Brusky, an emergency medicine physician.[2] Dr. Brusky ordered several tests for Richard, including a CT (computerized tomography) scan, an EKG (electrocardiogram), and various blood tests, to evaluate Richard's condition. While Richard was at St. Agnes, his symptoms began to diminish, and he told both his wife and Dr. Brusky that he was feeling better and wanted to go home.
¶ 7 Based on Richard's test results and his improving condition, Dr. Brusky concluded that Richard had suffered a transient ischemic attack, otherwise known as a TIA. A TIA occurs when a portion of the brain fails to receive enough oxygen, *906 resulting in stroke-like symptoms. According to one of the Bubbs' experts, a TIA is an "atherosclerotic disease, [caused by] a build-up of cholesterol plaque, often called `hardening of the arteries,' that can diminish the heart's capacity to provide blood to the brain." Unlike a stroke, where symptoms are permanent, TIA symptoms frequently resolve themselves within 24 hours.
¶ 8 Once Dr. Brusky had diagnosed Richard's condition, he telephoned Dr. Xian Feng Gu, a neurologist. Dr. Gu was in a position to provide a more specialized assessment of Richard's condition and admit him to the hospital or provide follow-up treatment. Dr. Brusky reviewed Richard's condition with Dr. Gu, who agreed to see Richard as a patient. Following this conversation, Dr. Brusky instructed Richard to take some Aspirin and contact Dr. Gu the next morning for follow-up treatment.
¶ 9 Dr. Brusky then discharged Richard from the hospital with specific "Aftercare Instructions" for a person who has been diagnosed with TIA.[3] Dr. Gu concurred with Dr. Brusky's decision to discharge Richard, with future treatment on an outpatient basis.
¶ 10 The following morning, October 25, Marjorie called Dr. Gu's office and scheduled the earliest available appointment November 5, 2001, which was 12 days after the October 24 incident.
¶ 11 On October 26, 2001, Marjorie returned home from work and found Richard on the bedroom floor pleading for help. Marjorie called for an ambulance, and Richard was taken to St. Joseph's Community Hospital in West Bend. At St. Joseph's, doctors determined that Richard had suffered a large-scale stroke, affecting the right side of his brain. The doctors at St. Joseph's discovered that Richard's right carotid artery, the blood vessel in his neck leading to the afflicted area of his brain, showed a 90-percent blockage. The stroke debilitated Richard to an extent that he presently has no use of his left arm and cannot walk without using a cane.
¶ 12 On September 3, 2003, the Bubbs filed a complaint against Drs. Brusky and Gu, alleging negligence in their care of Richard. Specifically, the complaint alleged that Dr. Brusky negligently failed to comply with prevailing standards of medical care by not appropriately diagnosing and treating Richard's condition before it escalated into a stroke. The Bubbs also alleged that Dr. Gu was negligent in failing to instruct his office staff that Richard's appointment should be prioritized, depriving Richard of timely treatment. Finally, the Bubbs alleged that Dr. Brusky was liable for failing to properly inform Richard of "additional diagnostic tests or alternate treatment plans" in lieu of discharge from the hospital.
¶ 13 At trial, several experts provided testimony regarding the treatment Richard received at St. Agnes Hospital, the alternative courses of action that could be employed when a physician is presented with a TIA, and the role of an emergency room physician. For example, the Bubbs presented evidence indicating that Dr. Brusky should have informed Richard that one alternative to discharge was admission to the hospital for further diagnostic testing to determine the cause of the TIA. According to one of the Bubbs' experts, *907 Dr. Burton Bentley II, a Doppler ultrasound is a testing protocol that helps determine carotid artery blockage and helps doctors determine whether a patient is at imminent risk of a stroke. Dr. Bentley testified that conducting a Doppler ultrasound is part of the standard of care for TIA patients in order for the treating physician to know whether the patient requires immediate additional treatment to prevent the TIA from becoming a large-scale stroke.
¶ 14 Dr. Brusky agreed during his testimony that admitting the patient and performing additional diagnostics, like the Doppler ultrasound, was a reasonable alternative course of treatment:
Q [Judith E. Tintinalli et al., Emergency Medicine: A Comprehensive Study Guide (5th ed. 2000)] says, "Patients with new onset TIAs should be admitted for evaluation of possible cardiac sources of TIAs or high-grade stenosis in the carotid arteries. The incidence of stroke after" the "TIA may be as high as 20 to 25 percent in the first year, with the highest incidence in the first month. Because of proven efficacy of carotid endarterectomy, patients should be admitted unless high-grade stenosis of the carotid artery can be ruled out." Did I read that correctly?
A That is correct.
....
Q [According to Tintinalli, supra], "Patients with new-onset TIAs should be evaluated for possible cardiac sources of TIAs or high-grade stenosis in the carotid arteries." Correct?
A Yes.
Q And that the highest incidence of stroke is within the first month, correct?
A Yes.
Q Now, you certainly would agree that it is reasonable medicine to admit a patient and order Doppler ultrasound, correct?
A No. It'sit's reasonable, I agree, but it's not necessarily what's done.
Q I'm not saying that you don'tyou testified that you don't do it, sir. But you would agree that there are many reasonable physicians that do?
A There are many ways of treating TIAs and this is one of the reasonable ways of doing it.
¶ 15 In response to the Bubbs' claims, Dr. Brusky presented evidence showing that there is an "ongoing debate in the medical community about how to address suspected TIA episodes after the initial evaluation." For example, Dr. Robert Stuart testified that "some medical institutions admit all TIA patients while others discharge them with a referral to a neurologist." Dr. Robert Powers testified that there is considerable debate and varied practice within the medical community over whether to use carotid Doppler ultrasounds in evaluating TIAs or whether to discharge a TIA patient with instructions for subsequent follow-up care with a specialist.
¶ 16 Furthermore, Dr. Powers noted that "an emergency department physician must make a general assessment and stabilize the patient, create a differential diagnosis and make an additional disposition or referral for additional care." Dr. Powers opined that Dr. Brusky performed the essential duties of an emergency room physician by diagnosing and stabilizing Richard and then referring him to a specialist whose expertise is better suited for long-term treatment. Dr. Powers also testified that, unless they have some additional specialty, emergency room physicians generally should not admit TIA patients because they lack neurological expertise.
*908 ¶ 17 At the close of evidence, the Bubbs submitted their proposed jury instructions, which included Wis JICivil 1023.2 (2009),[4] the instruction for informed consent claims under Wis. Stat. § 448.30. The Bubbs also submitted the special verdict questions for informed consent,[5] which are contained in Wis JICivil 1023.1 (2006).[6]
¶ 18 On December 19, 2006, Judge Wirtz conducted off-the-record discussions with the parties regarding jury instructions and the special verdict form related to the Bubbs' informed consent claim against Dr. Brusky. After those discussions concluded, Judge Wirtz stated on the record that he and the parties "had a rather lengthy discussion in this case about whether [Wis JICivil] 1023.2, the informed consent instruction, [would] be given" and that he had decided not to give the instruction to the jury. Following his statement, Judge Wirtz gave both parties the opportunity to summarize their arguments on the record, pursuant to State v. Munoz, 200 Wis.2d 391, 403, 546 N.W.2d 570 (Ct.App.1996) (stating that "it is essential that the subsequent on-the-record comments repeat or summarize the arguments and confirm exactly what was presented to the trial court at the time of its ruling").
¶ 19 The Bubbs' attorney took the opportunity, and he summarized his arguments as follows:
The legislature passed a statute, 448.30, and basically created a standard of care for doctors to inform patients about the availability of all alternative viable medical modes of treatment and about the benefits and risks of those treatments....
Now, I have elicited from every one of the defense experts that having a Doppler evaluation in a speedy manner that night or the following morning was a well-recognized form of treatment and, furthermore, the doctors all agree that a patient who is [discharged from] the hospital without proper evaluation has... as much as a 5 percent chance of having a stroke within 48 hours. The informed consent statute clearly talks to this. It says ... a doctor has the duty to provide his patient with the information necessary to enable the patient to make an informed decision about diagnostic treatment or a procedure and alternative choices of diagnostic treatments and procedures. If the doctor fails to do that, he's negligent.
....
There is no question that ... Dr. Brusky admitted that the advice given by Tintinalli[, supra,] and the other people in the textbooks was an alternative form of treatment, whether he provided it or got someone else to provide it....
There's no question in this case that everybody agrees that a highly stenosed carotid artery puts [Richard] at higher risk for having an early stroke. Is that information that can be told to him? Yes. [Are] there diagnostic tests that can be done to rule that out? Yes.... *909 And then the [c]ourt in Martin [v. Richards, 192 Wis.2d 156, 176, 531 N.W.2d 70 (1995),] says, "[T]here is a duty imposed on the physician to disclose to the patient the existence of any methods of diagnosis or treatment that would serve as feasible alternatives to the method initially selected by the physician to diagnose or treat the patient's illness or injur[y]." Well, what was Dr. Brusky's initial method? His initial method was to do the tests that he did in the ER room and send him home. What were the alternatives? The alternatives were to tell him about the other diagnostic tests that can be done, and how quickly they can be done, and what the purpose of those things can be. That is, clearly, what the [Martin] case is talking about.
And when you look at the informed consent instruction, it says that you have to tell him about alternative choices. It says, "The doctor must inform the patient whether a diagnostic procedure is ordinarily performed in the circumstances confronting the patient, whether alternative procedures approved by the medical profession are available," and "what the outlook is for success or failure of each alternative procedure." . . .
... Every single physician that I questioned agreed that the alternative reasonable treatment would be to hospitalize [Richard] and do a Doppler that night. They could have done a Doppler, they could have hospitalized him or, at least, inform him of the risks of not doing that procedure and the fact that they could get it done first thing in the morning, if necessary.
....
In ... the Martin case, the [s]upreme [c]ourt basically says, when it starts out, "This requires us to determine whether there was any credible evidence for the jury to determine whether Dr. Richards was negligent in failing to inform." Any credible evidence. There is so much credible evidence in this record, it's spilling out of the courtroom. Every single person talked about the alternative method of treatment. Every single person. And every single person said yes, that would be a fine thing if you wanted to do that....
....
You have to tell [the patients] about the test. You have to tell them about it andif you [have it] available, and you have to tell them about the significance of it and why it's important, and if it's not available immediately tonight, we can do it in the morning. You have to tell them about these things so that they can make a decision, so that the man doesn't leave the hospital blindly, not knowing anything about what could happen to him, not knowing that this condition could be ruled out and, boom, he has a stroke. That's the whole purpose. The duty is to inform the ... patient.
¶ 20 Dr. Brusky's attorney declined the invitation to summarize his off-the-record arguments:
Well, my understanding is the [c]ourt's ruled and read the Martin case. We had a long debate about this earlier this afternoon. I disagree with counsel. I don't think the Martin case is applicable. I could go through the whole litany, if you want me to, of why, as far as Dr. Brusky is concerned, this is not an informed consent case, but the [c]ourt's heard it and the [c]ourt's ruled.
THE COURT: You wish to make a record about what you said earlier?
[Dr. Brusky's Attorney]: No, I don't think I have to. You're ruling that you're not going to give informed consent and that's good enough for me.
¶ 21 After allowing the parties the opportunity to make a record of their arguments, Judge Wirtz summarized his reasoning for not giving the informed consent *910 jury instructions and special verdict questions. Distinguishing Martin, Judge Wirtz stated that, in Martin, the doctor "had no diagnosis and had a test that he could run in order to specifically rule out... what he was wondering about." According to Judge Wirtz, Dr. Brusky made a "specific diagnosis" of TIA that every expert agreed was correct, and "[Richard] was then told this [TIA] puts you at risk for stroke[,][y]ou should have follow-up soon[,] and a consultation was made to do that follow-up." Therefore, Judge Wirtz concluded, "[T]he facts between this case and Martin are quite different." Judge Wirtz also found significant that the carotid Doppler ultrasound would not have been performed until the next day, which he said raised "serious causation questions" for the informed consent claim. Finally, Judge Wirtz distinguished the informed consent claims against Dr. Brusky and Dr. Gu because, as the consulting physician rather than the treating physician, Dr. Gu had no duty to inform Richard of the diagnostic alternatives.
¶ 22 Following Judge Wirtz's decision not to give the informed consent jury instructions and special verdict questions, the jury returned a verdict of no negligence on the part of either Drs. Brusky or Gu in the standard of care they delivered to Richard.
¶ 23 The Bubbs brought a motion after the verdict for a new trial, pursuant to Wis. Stat. § 805.15(1), arguing that the jury's verdict was contrary to law and there were reversible errors in the trial. Specifically, the Bubbs claimed that Judge Wirtz improperly withheld the informed consent jury instructions and special verdict questions from the jury's consideration. Judge Wirtz dismissed the Bubbs' motion for a new trial and entered judgment against them and their insurer, The West Bend Company, "for their respective statutory costs, disbursements, and attorney's fees, according to the law."[7] The Bubbs appealed.
¶ 24 The Bubbs' principal argument in the court of appeals was that the jury "should have been properly instructed on an informed consent question and given the opportunity to resolve it." Bubb, 313 Wis.2d 187, ¶ 14, 756 N.W.2d 584. The majority opinion affirmed the circuit court's decision that Dr. Gu, a consulting physician, had no duty to provide information to a patient he was not treating. Id., ¶ 21. Accordingly, the court of appeals held that Dr. Gu could not be liable for failing to properly inform Richard. Id.
¶ 25 The court of appeals also discussed Wis. Stat. § 448.30 in some detail. "The informed consent statute requires that the patient be informed of alternatives that are available and viable." Id., ¶ 22. The court continued with the following:
Dr. Brusky did not have admitting privileges at St. Agnes Hospital and, therefore, hospitalizing Richard was not a viable option.... Dr. Brusky testified that ... he did not know of any ultrasound technician on call for the emergency department that night.... [T]he Bubbs' evidence did not establish that a carotid Doppler ultrasound was a viable alternative treatment for Richard's properly diagnosed TIA.
Id., ¶¶ 26-27.
¶ 26 Additionally, the court of appeals dedicated significant time to addressing the Bubbs' arguments in regards to Martin. The court noted that the doctor in Martin failed to inform the patient on two important issues: (1) that a CT scan was *911 available and could detect intracranial bleeding; and (2) that the hospital was not equipped to treat intracranial bleeding if it should occur or be found. See id., ¶ 24. Because Dr. Brusky correctly diagnosed Richard's condition, and because there was no apparent consensus in the medical community mandating that physicians perform carotid Doppler ultrasounds to detect artery blockage in patients suffering a TIA, the court of appeals affirmed the circuit court's decision. See id., ¶ 26.
¶ 27 Judge Brown wrote a dissenting opinion, the thrust of which is as follows:
For me the question in this case is simply this: When there is widespread debate in the medical community about two distinct protocols for addressing a medical condition, must the treating physician inform the patient of the alternatives? In my view, that question is answered "yes" by W[is]. S[tat]. § 448.30, which states that "any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments."
Id., ¶ 31. Judge Brown characterized the language in Martin as properly framing the inquiry: "`[W]hat would a reasonable person in the patient's position want to know in order to make an intelligent decision with respect to the choices of treatment or diagnosis?'" Id., ¶ 32 (quoting Martin, 192 Wis.2d at 176, 531 N.W.2d 70). Further, Judge Brown reasoned that "the statute is not about whether the doctor makes the right medical decision, but rather about whether the doctor provides the patient with the information that the patient needs to make a decision of his or her own." Id. Because Dr. Brusky proceeded down one course of actionno admission with instructions for follow-up carewithout informing Richard of the alternative course of actionadmission with further diagnostic testingJudge Brown would have held that Dr. Brusky failed to properly inform Richard of available and viable alternatives, as required by the statute. See id., ¶ 33.
¶ 28 Following the decision of the court of appeals, the Bubbs petitioned this court for review, arguing for a new trial against Dr. Brusky on the issue of informed consent. We granted the petition for review on September 11, 2008.

II. STANDARD OF REVIEW
¶ 29 In this case, the Bubbs' informed consent claim against Dr. Brusky was pleaded in the complaint, argued at trial, and dismissed at the close of evidence before going to the jury. The procedural mechanism used by the circuit court to dismiss the claim is not clear because Dr. Brusky did not file a motion to dismiss, and the record does not reveal the authority the circuit court used in making its decision. However, we note that a party may move to dismiss a claim at the close of evidence under Wis. Stat. § 805.14(4), before the case goes to the jury.
¶ 30 A motion under Wis. Stat. § 805.14(4) challenges the sufficiency of the evidence presented and allows a claim to be dismissed, as a matter of law, if the circuit court "is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party." Wis. Stat. § 805.14(1), (4) (emphasis added). Although there was no motion submitted in this case, we treat the circuit court's dismissal of the informed consent claim against Dr. Brusky as if a motion had been made under Wis. Stat. § 805.14(4).
¶ 31 To determine whether the circuit court erred when it decided, as a *912 matter of law, that the Bubbs did not present a claim against Dr. Brusky under Wis. Stat. § 448.30, we review the court's decision to resolve whether there was any credible evidence in the record for the jury to determine that Dr. Brusky was negligent in failing to adequately inform the Bubbs regarding "alternate, viable medical modes of treatment"[8] for Richard's TIA.[9] Wis. Stat. § 805.14(1), (4); Martin, 192 Wis.2d at 167, 531 N.W.2d 70; see also Christianson v. Downs, 90 Wis.2d 332, 334-35, 279 N.W.2d 918 (1979)
A motion for dismissal for insufficiency of the evidence should not be granted unless there is no credible evidence to support a finding in favor of the plaintiff when all credible evidence and reasonable inferences therefrom are considered in the light most favorable to the plaintiff. This test serves the purpose of preserving a litigant's right to a jury determination of factual disputes.
¶ 32 This case also involves the interpretation of Wis. Stat. § 448.30. Statutory interpretation presents a question of law that this court reviews de novo. Rechsteiner v. Hazelden, 2008 WI 97, ¶ 26, 313 Wis.2d 542, 753 N.W.2d 496.

III. DISCUSSION
¶ 33 The Bubbs contend that the circuit court committed reversible error by improperly dismissing their informed consent claim. They assert that an informed consent claim under Wis. Stat. § 448.30 is "separate and distinct" from medical negligence claims alleging breaches of the standard of care.
¶ 34 After establishing that their informed consent claim is separate and distinct from any other claim, the Bubbs focus attention on this court's decision in Martin, suggesting that their case is indistinguishable from Martin. The Bubbs point to the following similarities:
(A) In both cases, the treating physician was an emergency medicine physician without admitting privileges.
(B) In both cases, there was a firm diagnosis. In Martin, the patient was diagnosed with a concussion; in this case, the patient was diagnosed with a TIA.
(C) In both cases, there was a failure to inform the patient of alternative diagnostic tests that could have been performed. In Martin, there was a failure to inform the patient about the availability of a CT scan; in this case, there was a failure to inform the Bubbs about the alternative course of admitting Richard to the hospital and performing a Doppler ultrasound.
(D) In both cases, the plaintiffs' standard of care claims were unsuccessful.
(E) In both cases, the plaintiffs' informed consent claims were dismissed by the circuit court judge. In Martin, the claim was dismissed *913 pursuant to a motion after the jury's verdict; in this case, the claim was dismissed without a motion before going to the jury.
¶ 35 The Bubbs argue that because this court affirmed the court of appeals' reversal of the circuit court's decision in Martin dismissing the informed consent claim, it should conclude here that the Bubbs presented a prima facie case under Wis. Stat. § 448.30 that should have been resolved by a jury.
¶ 36 Although the Bubbs admit that the decisions of whether to admit Richard and to perform additional diagnostic testing, such as the carotid Doppler ultrasound, were "medical decision[s] left to the judgment of the physicians," they assert that, under Martin, Richard "had an absolute right to know about the[] alternatives and choose for himself." For support, the Bubbs quote the following statement from Martin:
It may well be a "medical decision" under these circumstances to decide not to do a CT scan, or to decide not to hospitalize the patient in a hospital that can treat an intracranial bleed if it should occur. The statute on its face says, however, that the patient has the right to know, with some exceptions, that there are alternatives available. The doctor might decide against the alternative treatments or care, he might try to persuade the patient against utilizing them, but he must inform them when a reasonable person would want to know. Here, Mr. Martin could have decided to have a CT scan done or could have decided to take Ms. Martin to another hospital with a neurosurgeon.
Martin, 192 Wis.2d at 181, 531 N.W.2d 70.
¶ 37 The Bubbs' argument is that, "[w]hile Dr. Brusky made the medical decision not to admit [Richard] and perform a carotid Doppler ultrasound, the analysis does not end" there because Richard, like the Martins, had a right to know all viable alternatives to the treatment he received.
¶ 38 The Bubbs also take issue with the procedure used by the circuit court to dismiss their informed consent claim. The Bubbs argue that the circuit court dismissed their claim without a motion pending before it. Consequently, they assert that the circuit court's "decision was improper as a matter of law."
¶ 39 The Bubbs state that the only authority that allows a circuit court to dismiss a properly pleaded claim is found in Wis. Stat. § 805.14(3), governing a motion to dismiss at the close of the plaintiff's case, and Wis. Stat. § 805.14(4), governing a motion for a directed verdict at the close of all evidence. According to the Bubbs, neither subsection is appropriate unless "there is no credible evidence to sustain a finding in favor of the plaintiff's claim." The Bubbs contend that it was inappropriate for the circuit court to invoke either subsection of Wis. Stat. § 805.14 in eliminating their informed consent claim because "it is undisputed that" Dr. Brusky did not move the court to make such a determination and "the Bubbs presented more than enough evidence" to send their informed consent claim to the jury.
¶ 40 For example, the Bubbs reason that evidence presented by the defense and Dr. Brusky's own testimony established that admission to the hospital for further diagnostic testing using the carotid Doppler ultrasound was a well-accepted, alternative course of action that could have been employed in treating Richard's TIA.
¶ 41 The Bubbs also contend that the circuit court must have concluded there was sufficient evidence establishing the availability of alternative courses of action in treating Richard's condition. Otherwise, they claim, the court would not have included the optional paragraph in the standard medical negligence jury instructiona paragraph that is to be used, as it *914 expressly states, "only if there is evidence of two or more alternative methods of treatment or diagnosis recognized as reasonable." Wis JICivil 1023 (2009).[10]
¶ 42 Finally, the Bubbs conclude their argument by stating that, if a carotid Doppler ultrasound had been performed on Richard either that night or the next day at the hospital, then Richard's 90-percent stenosed carotid artery would have been diagnosed prior to his stroke. The Bubbs reason that, because Richard was sent home without having a carotid Doppler ultrasound performed and he developed a stroke before receiving follow-up treatment, the failure to inform Richard of the alternative courses of action available was a cause of the debilitating injuries he suffered following the stroke.
¶ 43 In response, Dr. Brusky presents four arguments to rebut the Bubbs' contention that their informed consent claim was improperly dismissed. First, Dr. Brusky asserts that he treated Richard on an emergency basis only and he satisfied all his duties as an emergency medicine physician. He contends he never proposed to treat Richard for his underlying neurological conditionthe stenosed carotid arteryand therefore, "he had no duty to inform [Richard] about tests that a neurologist might recommend in follow-up." Dr. Brusky argues that requiring more from an emergency medicine physician would "impose upon [such an emergency physician] a duty to be, in effect, a specialist in numerous medical specialties."
¶ 44 Second, Dr. Brusky maintains that this case was a standard of care case, not an informed consent case. He claims "[t]he mere fact that there is a dispute on how patients should be managed does not necessarily trigger an informed consent claim" because the doctor may reasonably employ any one of the available options without breaching his standard of care. Ultimately, Dr. Brusky argues that "choosing between two recognized methods [of treatment or diagnosis] doesn't necessarily mean that the physician must instruct the patient on the other recognized method."
¶ 45 Third, Dr. Brusky disputes the Bubbs' argument that this case is analogous to Martin. He agrees with the circuit court and the court of appeals that the two cases are distinguishable. Specifically, Dr. Brusky notes that both lower courts found it significant that he made a correct diagnosis of Richard's condition, whereas the doctor in Martin did not make the correct diagnosis. Therefore, Dr. Brusky argues that the diagnostic tests in question in Martin and this case differ significantly in that the test in Martin would have been used to make the correct diagnosis. Here, Dr. Brusky claims he made the correct diagnosis from the beginning, and the carotid Doppler ultrasound "was part of the follow-up for the underlying condition."
¶ 46 Finally, Dr. Brusky takes the position that the circuit court properly withheld the Bubbs' informed consent claim from the jury because it failed to establish causation. His reasoning is twofold: (1) it is "speculative at best" as to whether all the necessary preconditions for getting Richard to surgery would have been completed before his stroke; and (2) it is questionable as to whether a carotid Doppler ultrasound "could have been completed on" the night Richard presented to the emergency room at St. Agnes. Essentially, Dr. Brusky argues that, even if Richard would have been informed of the alternative course of treatment of admission and further testing, it is debatable whether anything could have been done to save Richard from having a stroke.

*915 A. Wisconsin's Common Law Informed Consent Doctrine
¶ 47 Wisconsin courts developed a common law doctrine of informed consent before 1982, the year in which Wis. Stat. § 448.30 was adopted.[11]See, e.g., Scaria v. St. Paul Fire & Marine Ins. Co., 68 Wis.2d 1, 11, 227 N.W.2d 647 (1975); Trogun v. Fruchtman, 58 Wis.2d 569, 596, 207 N.W.2d 297 (1973). The doctrine originally developed as a tort claim for intentional battery in recognition of "the fundamental notion of the right to bodily integrity." Johnson v. Kokemoor, 199 Wis.2d 615, 628, 545 N.W.2d 495 (1996); see also Hannemann v. Boyson, 2005 WI 94, ¶ 34, 282 Wis.2d 664, 698 N.W.2d 714 (citing Trogun, 58 Wis.2d at 596, 207 N.W.2d 297); Martin, 192 Wis.2d at 170, 531 N.W.2d 70.[12]
¶ 48 In the classic situation giving rise to a common law informed consent claim, a patient would "consent[] to a certain type of operation but, in the course of that operation, [would be] subjected to other, unauthorized operative procedures." Johnson, 199 Wis.2d at 628-29, 545 N.W.2d 495 (citing as examples Paulsen v. Gundersen, 218 Wis. 578, 584, 260 N.W. 448 (1935) and Throne v. Wandell, 176 Wis. 97, 186 N.W. 146 (1922)). Common law informed consent claims also included cases "where the patient had not received [adequate] information about the risks associated with the medical procedure." Martin, 192 Wis.2d at 170, 531 N.W.2d 70.
¶ 49 This latter category of informed consent cases, where the doctor simply failed to disclose risks associated with a certain treatment, "fit uncomfortably, or not at all, within the intentional, antisocial nature of battery." Id. at 171, 531 N.W.2d 70; see also Trogun, 58 Wis.2d at 598-600, 207 N.W.2d 297. Consequently, in 1973, the Wisconsin Supreme Court changed course and held that "it is preferable to affirmatively recognize a legal duty, bottomed upon a negligence theory of liability, in cases wherein it is alleged the patient-plaintiff was not informed adequately of the ramifications of a course of treatment."[13]Trogun, 58 Wis.2d at 600, 207 *916 N.W.2d 297 (emphasis added).[14]
¶ 50 Trogun stated that, in general, "[t]he negligence theory of liability has taken many shapes, although common to all is the existence of the duty to disclose or warn on the part of a physician and exposure to negligence liability when such duty is not properly discharged." Id. at 598, 207 N.W.2d 297 (emphasis added). In particular, the court endorsed the standard set forth by the U.S. Court of Appeals in Canterbury v. Spence, 464 F.2d 772, 781 (D.C.Cir.1972), which stated that for a physician to fully satisfy the standard of due care, she must inform the patient "of any risks to his well-being which contemplated therapy may involve." See Trogun, 58 Wis.2d at 600, 207 N.W.2d 297.
¶ 51 Trogun also recognized that the standard for adequate disclosure was "not `dependent upon the existence and nonperformance of a relevant professional tradition,' [Canterbury, 464 F.2d at 783,] and [was] to be judged by that conduct which is reasonable under the circumstances," Trogun, 58 Wis.2d at 600, 207 N.W.2d 297 (citing Canterbury, 464 F.2d at 785) (internal footnotes omitted). What is reasonable under the circumstances, Trogun observed, "must be measured by the patient's `objective' need for information material to his decision." Id. at 601, 207 N.W.2d 297 (citing Canterbury, 464 F.2d at 787) (emphasis added); see also Cobbs v. Grant, 8 Cal.3d 229, 104 Cal. Rptr. 505, 502 P.2d 1, 11 (1972) ("[T]he patient's right of self-decision is the measure of the physician's duty to reveal.").
¶ 52 Moreover, according to Trogun, if the failure to inform could be established by a plaintiff using the above standard, then liability would attach if the plaintiff could demonstrate "a causal connection between the physician's failure to disclose and the injury to the patient." Trogun, 58 Wis.2d at 602, 207 N.W.2d 297 (citing Cobbs, 104 Cal.Rptr. 505, 502 P.2d at 11). The Trogun court explained that the test for whether there is a causal connection "is not one of hindsight but an objective standard: what would the average prudent person in the patient's position have decided if informed of the perils." Id. at 603, 207 N.W.2d 297 (emphasis added).
¶ 53 Two years after Trogun, in 1975, this court took up Scaria, another informed consent case, and reaffirmed the reasonable patient standard adopted in Trogun. See Scaria, 68 Wis.2d at 11, 13, 227 N.W.2d 647. The Scaria court stated *917 that a physician has a duty "to make such disclosures as appear reasonably necessary under circumstances then existing to enable a reasonable person under the same or similar circumstances confronting the patient at the time of disclosure to intelligently exercise his right to consent or to refuse the treatment or procedure proposed." Id. at 13, 227 N.W.2d 647 (emphasis added). The court made clear that a physician's duty of disclosure is measured objectively under the reasonableness standard by noting that the "community standard" (based on what the average doctor in the community would disclose to the patient) is "certainly relevant and material" but not determinative in evaluating whether the physician satisfied her duty of disclosure. Id. at 12, 227 N.W.2d 647.
¶ 54 The court also made clear that, because the informed consent standard adopted in Trogun was an objective standard based on negligence principles such as reasonableness, the physician's duty to inform is not boundless. See id. at 11, 12-13, 227 N.W.2d 647. The court noted that the physician's duty to inform does not mean he is "required to know every potential risk but only those known to a reasonably well-qualified practitioner or specialist commensurate with his classification in the medical profession." Id. at 11, 227 N.W.2d 647. Moreover, the court listed the following additional limitations to a physician's duty of disclosure:
A doctor should not be required to give a detailed technical medical explanation that in all probability the patient would not understand. He should not be required to discuss risks that are apparent or known to the patient. Nor should he be required to disclose extremely remote possibilities that at least in some instances might only serve to falsely or detrimentally alarm the particular patient. Likewise, a doctor's duty to inform is further limited in cases of emergency or where the patient is a child, mentally incompetent or a person is emotionally distraught or susceptible to unreasonable fears.
Id. at 12-13, 227 N.W.2d 647 (internal footnote omitted).
¶ 55 Finally, Scaria discussed the importance of utilizing the reasonableness standard for determining cause in informed consent claims. Id. at 13-15, 227 N.W.2d 647. Without an objective standard, the court contended, the cause determination would come down to an assessment of the patient's credibility in testifying as to what she would have done had she been fully informed. Id. at 15, 227 N.W.2d 647. This, the court thought, was unsatisfactory:
[W]hen causality is explored at a post[-]injury trial with a professedly uninformed patient, the question whether he actually would have turned the treatment down if he had known the risks is purely hypothetical: "Viewed from the point at which he had to decide, would the patient have decided differently had he known something he did not know?" And the answer which the patient supplies hardly represents more than a guess, perhaps tinged by the circumstance that the uncommunicated hazard has in fact materialized.
In our view, this method of dealing with the issue on causation comes in second-best. It places the physician in jeopardy of the patient's hindsight and bitterness. It places the fact[-]finder in the position of deciding whether a speculative answer to a hypothetical question is to be credited. It calls for a subjective determination solely on testimony of a patient-witness shadowed by the occurrence of the undisclosed risk.
Better it is, we believe, to resolve the causality issue on an objective basis: in terms of what a prudent person in the patient's position would have decided if *918 suitably informed of all perils bearing significance. If adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk or danger that resulted in harm, causation is shown, but otherwise not.
Id. at 14, 227 N.W.2d 647 (quoting Canterbury, 464 F.2d at 790-91) (internal quotations omitted).
¶ 56 Ultimately, the objective standards set forth in Trogun and reaffirmed in Scaria governed common law informed consent claims in Wisconsin and were the impetus for the legislature's decision to create Wis. Stat. § 448.30, the informed consent statute.

B. Wisconsin Stat. § 448.30
¶ 57 Wisconsin Stat. § 448.30 reads, in its entirety, as follows:

448.30 Information on alternate modes of treatment. Any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments. The physician's duty to inform the patient under this section does not require disclosure of:
(1) Information beyond what a reasonably well-qualified physician in a similar medical classification would know.
(2) Detailed technical information that in all probability a patient would not understand.
(3) Risks apparent or known to the patient.
(4) Extremely remote possibilities that might falsely or detrimentally alarm the patient.
(5) Information in emergencies where failure to provide treatment would be more harmful to the patient than treatment.
(6) Information in cases where the patient is incapable of consenting.
The language of the statute "codifies the common law set forth in Scaria." Johnson, 199 Wis.2d at 629-30, 545 N.W.2d 495 (emphasis added); Hannemann, 282 Wis.2d 664, ¶ 48, 698 N.W.2d 714 ("[Section] 448.30 was enacted in order to codify the common-law standards for informed consent set forth in Scaria."); Martin, 192 Wis.2d at 174, 531 N.W.2d 70 ("[T]he Wisconsin legislature codified the standard articulated in Scaria in sec. 448.30, Stats."). In fact, the Legislative Reference Bureau Note to 1981 A.B. 941, the bill that became Wis. Stat. § 448.30, includes the following statement: "The bill places in the statutes the standard of care that physicians are required to meet under Scaria." See Martin, 192 Wis.2d at 174, 531 N.W.2d 70. The informed consent statute was enacted in 1982 and remains in its original form today. See § 2, ch. 375, Laws of 1981. Consequently, the standards set forth in Trogun and Scaria are implicated in the interpretation of Wis. Stat. § 448.30.
¶ 58 For example, in Martin, the supreme court relied heavily upon Trogun and Scaria for its interpretation of Wis. Stat. § 448.30. Martin involved a 14-year old girl who rode her bicycle into the back of a dump truck, causing her injuries that required emergency care at Fort Atkinson Memorial Hospital (FAMH). Martin, 192 Wis.2d at 162, 531 N.W.2d 70. The emergency physician who treated the girl made a differential diagnosis of concussion, contusion, and possible intracranial bleeding based on her symptoms.[15]Id. at 164, 531 *919 N.W.2d 70. Then, "[i]n an attempt to determine which diagnosis was correct, he performed several neurological tests as well as skull x-rays. Based upon the results of these tests, [the emergency physician] ultimately diagnosed [the girl] as having a concussion." Id.
¶ 59 The emergency physician explained his diagnosis to the girl's father and advised him that there were two appropriate alternatives available for treating the girl's condition: (1) "send [her] home under the care of a responsible adult, or" (2) "admit [her] to the hospital for observation." Id. The emergency physician did not inform the girl's father that a CT scan could be performed at the hospital to further diagnose the girl's head injuries. Id. In addition, the physician did not inform the girl's father that if a neurological complication would be detected or would arise while the girl was at FAMH, "she would have to be transferred to a different hospital because FAMH did not have a neurosurgeon." Id. The girl's father decided to have her admitted to the hospital that evening. Id.
¶ 60 Very early the next morning, the girl's condition deteriorated to the point that she had to be transferred by helicopter to the University of Wisconsin (UW) Hospital in Madison. Id. at 165, 531 N.W.2d 70. CT scans were performed at the UW Hospital and intracranial bleeding was discovered. Id. The girl required two emergency surgeries to relieve the bleeding. Id. The surgeries were only partially successful, leaving the girl a partial spastic quadriplegic. Id.
¶ 61 As part of a larger malpractice action, the girl and her family filed an informed consent claim against the emergency physician for his failure to disclose "the existence of alternate forms of care and treatment." Id. at 166, 531 N.W.2d 70. The jury found the physician liable on this claim alone and awarded the girl and her family "almost 5 million dollars in damages."[16]Id. However, following the verdict, the circuit court granted the emergency physician's motion to dismiss the informed consent claim because "[t]he court believed that under sec. 448.30, Stats., the doctors had no duty to inform [the girl's father] about diagnostic or treatment alternatives with respect to what it characterized as the `extremely remote' possibility that [the girl] would develop an intracranial bleed." Id. The court of appeals reversed, disagreeing with the circuit court that a one to three percent chance of the girl developing an intracranial bleed was "extremely remote" given the serious consequences that can result from such a condition. Id. at 166-67, 531 N.W.2d 70. The issue was then presented to this court for review.
¶ 62 Initially, this court observed that the language of Wis. Stat. § 448.30 "appears clear in its directive. The difficulty in applying the statute, however, is in determining how far the duty to disclose extends, i.e., what is considered an alternate, viable mode of treatment." Id. at 169, 531 N.W.2d 70. In making this determination, the court referenced Scaria and re-emphasized "that the standard for informed consent cannot be defined by the medical profession" because the decision of what mode of treatment to proceed with "is not a medical decision." Id. at 174, 531 N.W.2d 70; see also Hannemann, 282 Wis.2d 664, ¶¶ 35-36, 38-39, 40, 46, 698 N.W.2d 714; Johnson, 199 Wis.2d at 633-34, 649, 545 N.W.2d 495; Scaria, 68 Wis.2d at 12, 227 N.W.2d 647. Instead, the court stated, "[t]he decision must be made by the patient, and a patient cannot make an informed, intelligent decision to consent to *920 a physician's suggested treatment unless the physician discloses what is material to the patient's decision, i.e., all of the viable alternatives and risks of the treatment proposed." Martin, 192 Wis.2d at 174, 531 N.W.2d 70; see also Hannemann, 282 Wis.2d 664, ¶¶ 35-36, 46, 698 N.W.2d 714; Johnson, 199 Wis.2d at 630-31, 640, 645, 545 N.W.2d 495; Scaria, 68 Wis.2d at 13, 227 N.W.2d 647; Trogun, 58 Wis.2d at 600-02, 207 N.W.2d 297. The extent of this disclosure, the court concluded, "is driven ... by what a reasonable person under the circumstances then existing would want to know, i.e., what is reasonably necessary for a reasonable person to make an intelligent decision with respect to the choices of treatment or diagnosis."[17]Martin, 192 Wis.2d at 174, 531 N.W.2d 70 (emphasis added); see also Johnson, 199 Wis.2d at 631, 637-40, 545 N.W.2d 495; Scaria, 68 Wis.2d at 11, 13, 227 N.W.2d 647; Trogun, 58 Wis.2d at 600-02, 207 N.W.2d 297. The court presumed that this standard is embodied in Wis. Stat. § 448.30 by "the use of the word `viable.'" Martin, 192 Wis.2d at 174-75, 531 N.W.2d 70.
¶ 63 In addition, the Martin court made clear that the physician's duty of disclosure "under the statute is not limited to affirmative violations of bodily integrity." Id. at 175, 531 N.W.2d 70 (emphasis added). The court explained as follows:
There can be no dispute that the language in Scaria, 68 Wis.2d at 13, 227 N.W.2d 647, requires that a physician disclose information necessary for a reasonable person to make an intelligent decision with respect to the choices of treatment or diagnosis. Because this standard was adopted by the legislature, as indicated by the [Legislative Reference Bureau] notes, the phrase "modes of treatment" in sec. 448.30, Stats., should not be construed so as to unduly limit the physician's duty to provide information which is reasonably necessary under the circumstances. Such a reading would be contrary to Scaria. Certainly, procedures which are purely diagnostic in nature are not excluded from sec 448.30's reach. In Scaria, itself, the plaintiff's injuries resulted from... a diagnostic procedure. Id. at 4, 227 N.W.2d 647. The distinction between diagnostic and medical treatments is not in and of itself significant to an analysis of informed consent.

Martin, 192 Wis.2d at 175, 531 N.W.2d 70 (emphasis added).
¶ 64 Applying Wis. Stat. § 448.30 in line with the principles set forth in Trogun and Scaria, the Martin court reinstated the jury's finding of liability against the emergency physician on informed consent. Id. at 182, 531 N.W.2d 70. The court reasoned that "there was credible evidence for the jury to determine that in order to make an intelligent decision regarding the choices of treatment or diagnosis, a reasonable person, under the circumstances then existing, would have wanted to know" the following information: (1) that a CT scanner was available and would have detected any neurological complications resulting from the girl's injuries; and (2) that if the girl would have developed neurological complications, she would have needed to be transferred to a hospital with a neurosurgeon for further treatment.[18]Id.
*921 ¶ 65 In making its decision, the Martin court dismissed two arguments made by the emergency physician. First, the court rejected the argument that Wis. Stat. § 448.30 does not impose a duty on physicians "to inform patients of alternate treatments for a condition not diagnosed or not being treated by the physician." Id. at 180, 531 N.W.2d 70. The court rejected this argument because it "ignore[d] the facts" of the case:
[The emergency physician] believed [the girl] had a concussion. He did not believe she was bleeding at the time he diagnosed concussion. But given the circumstances of this case, that does not end the inquiry. [The emergency physician] knew that delayed intracranial bleeding was a condition of his diagnosis. He could not rule it out. He knew there was a distinct possibility that intracranial bleeding might occur. In sum, he knew that [the girl's] condition was more serious than a simple concussion. He knew that associated with this concussion was the possibility of a delayed intracranial bleed. It was this condition (the excessive vomiting, the amnesia, the unconsciousness of an undetermined time, the injury to the head) not the diagnosis, that drives the duty to inform in this case. The statute speaks to information about alternate modes of treatment; it is not limited in title or in text to "Information on alternate modes of treatment for diagnosis."
Id. at 180-81, 531 N.W.2d 70 (second and third emphasis added).
¶ 66 The court also rejected as clearly mistaken the emergency physician's argument that these were medical decisions, thus relieving him of the duty to disclose adequate information:
When a reasonable person would want to know about an alternative treatment or method of diagnosis such as a CT scan or hospitalization in a facility with a neurosurgeon, the decision is not the doctor's alone to make.
It may well be a "medical decision" under these circumstances to decide not to do a CT scan, or to decide not to hospitalize the patient in a hospital that can treat an intracranial bleed if it should occur. The statute on its face says, however, that the patient has the right to know, with some exceptions, that there are alternatives available. The doctor might decide against the alternate treatments or care, he might try to persuade the patient against utilizing them, but he must inform them when a reasonable person would want to know. Here, [the girl's father] could have decided to have a CT scan done or could have decided to take [the girl] to another hospital with a neurosurgeon. In fact, the jury found that [the father] would have agreed to the alternate forms of care and treatment had he been informed of their availability.
Id. at 181, 531 N.W.2d 70 (emphasis added).
¶ 67 Martin was decided in 1995. A year later, this court further clarified its interpretation of Wis. Stat. § 448.30 in Johnson. In Johnson, the court rejected the defendant's proposed "`bright-line' rule requiring physicians to disclose only significant complications intrinsic to the contemplated procedure." Johnson, 199 Wis.2d at 637-39, 545 N.W.2d 495. Instead, the court reiterated, with reference to Trogun and Scaria, that "Wis[.] Stat. § 448.30 explicitly requires disclosure of more than just treatment complications associated with a particular procedure. Physicians must, the statute declares, disclose the availability of all alternate, viable medical modes of treatment in addition to the benefits and risks of these treatments." Id. at 640, 545 N.W.2d 495 *922 (internal quotations omitted) (emphasis added).[19]
¶ 68 The preceding discussion illustrates that the standards set forth in Trogun and Scaria continue to guide our interpretation of Wis. Stat. § 448.30, and we see no reason to depart from these standards in interpreting the statute in the present case.
¶ 69 With these standards in mind, we conclude that there is credible evidence in the record from which a reasonable jury could find that Dr. Brusky failed, in violation of Wis. Stat. § 448.30, to adequately inform the Bubbs "of all alternate, viable medical modes of treatment and about the benefits and risks of th[o]se treatments." See Wis. Stat. § 448.30.
¶ 70 First, there is credible evidence in the record from which a reasonable jury could conclude that there were reasonable alternatives available for treating Richard's TIA. Most pertinently, Dr. Brusky's own testimony establishes that admitting Richard to the hospital[20] and ordering a carotid Doppler ultrasound was "one of the reasonable ways of" treating a TIA. Second, expert testimony elicited during the trial demonstrates that there is considerable debate in the medical community over whether to admit patients immediately after a TIA episode or to discharge them with instructions and a referral to a neurologist. The fact this debate exists presents credible evidence for the jury to believe that there were reasonable alternative treatments available for Richard. Third, the circuit court's decision to include the alternative paragraph to the standard medical negligence jury instruction, which is to be used "only if there is evidence of two or more alternative methods of treatment or diagnosis recognized as reasonable," demonstrates that credible evidence was presented to show that a reasonable alternative mode of treatment existed. See Wis JICivil 1023.
¶ 71 Because there is credible evidence for the jury to conclude that admission to the hospital and further diagnostic testing was a reasonable alternative mode of treatment available for Richard's condition, the question is whether there is credible evidence in the record to support the notion that this alternative was viable. See Martin, 192 Wis.2d at 174-75, 531 N.W.2d 70. In other words, could the Bubbs have "ma[d]e an informed, intelligent *923 decision to consent" to Dr. Brusky's suggested mode of treatmentdischarge from the hospital with instructions for follow-up carewithout being informed of the alternativeadmission to the hospital with further diagnostic testing? Id. at 174, 531 N.W.2d 70; see also Hannemann, 282 Wis.2d 664, ¶¶ 35-36, 46, 698 N.W.2d 714; Johnson, 199 Wis.2d at 630-31, 640, 645, 545 N.W.2d 495; Scaria, 68 Wis.2d at 13, 227 N.W.2d 647; Trogun, 58 Wis.2d at 600-02, 207 N.W.2d 297. This answer is dictated "by what a reasonable person under the circumstances then existing would want to know." Martin, 192 Wis.2d at 174, 531 N.W.2d 70; see also Johnson, 199 Wis.2d at 631, 637-40, 545 N.W.2d 495; Scaria, 68 Wis.2d at 11, 13, 227 N.W.2d 647; Trogun, 58 Wis.2d at 600-02, 207 N.W.2d 297.
¶ 72 Credible evidence in the record, including statistics related to the increased risk of stroke following a TIA, the severe consequences that can result from a stroke, and the fact that a stenosed carotid artery is a possible cause of a TIA, demonstrates that a reasonable jury could conclude that a reasonable person in Richard's condition would have wanted to know about the alternative of admission with further diagnostic testing.[21]See Johnson, 199 Wis.2d at 631, 637-40, 545 N.W.2d 495; Martin, 192 Wis.2d at 174, 531 N.W.2d 70; Scaria, 68 Wis.2d at 11, 13, 227 N.W.2d 647; Trogun, 58 Wis.2d at 600-02, 207 N.W.2d 297.
¶ 73 Finally, there is credible evidence in the record from which a reasonable jury could conclude that Dr. Brusky's failure to adequately inform the Bubbs of the alternative mode of treatment available was a cause of Richard's injuries that resulted from his stroke. The same evidence bearing on whether a reasonable patient in Richard's position would have wanted to know about the reasonable alternative mode of treatment that was available, see supra, ¶ 72, is also credible evidence for the jury to determine whether a reasonable patient in Richard's condition would have refused Dr. Brusky's recommended mode of treatment if the patient had been informed of the alternative, see Johnson, 199 Wis.2d at 651, 545 N.W.2d 495, Scaria, 68 Wis.2d at 14-15, 227 N.W.2d 647, Trogun, 58 Wis.2d at 603-04, 207 N.W.2d 297.
¶ 74 Furthermore, the record contains testimony indicating that if the carotid Doppler ultrasound was performed either that night or the next day, Richard's stenosed carotid artery would have been detected, and he would have been immediately medicated and prepared for emergency surgery.[22] Therefore, we can say *924 there is credible evidence in the record from which a reasonable jury could conclude that Dr. Brusky's failure to adequately inform the Bubbs of the reasonable alternate mode of treatment available was a cause of his injuries that resulted from his stroke. See Wis JICivil 1023.1. Ultimately, causation is a question for the jury.[23]
¶ 75 In conclusion, we note that one of Dr. Brusky's arguments in defending against the Bubbs' informed consent claim is that he properly discharged his duties as an emergency physician, and to require more would create undue hardship on emergency physicians because they would be forced to have specialized knowledge in many areas of medicine in which they are not trained. This concern, which is legitimate, is greatly alleviated by the express language of the statute, placing limits on the physician's duty of disclosure. See Wis. Stat. § 448.30(1)-(6).[24]
¶ 76 In particular, Wis. Stat. § 448.30(1) limits a physician's duty of disclosure to information that "a reasonably well-qualified physician in a similar medical classification would know." See Scaria, 68 Wis.2d at 11, 227 N.W.2d 647. Therefore, Dr. Brusky's concern that he and other emergency physicians will be required to provide patients with information outside their field of knowledge should be minimal given the statutory language. See Wis. Stat. § 448.30(1); Scaria, 68 Wis.2d at 11, 227 N.W.2d 647. For instance, Dr. Brusky is not being asked to provide information outside his field of knowledge; he acknowledged in his testimony that admission and further diagnostic testing was a reasonable alternative course of action in treating patients after a TIA. The jury determined he was not negligent in his standard of care for failing to employ this alternative when treating Richard, but that did not relieve Dr. Brusky of his duty to inform the Bubbs "about the availability of all alternate, viable medical modes of treatment." Wis. Stat. § 448.30.
¶ 77 Another way the statute limits Dr. Brusky's duty in this case is that he does not necessarily have a duty to inform Richard of which particular diagnostic tests should be employed or the details of those tests. This would likely be either "[i]nformation beyond what a reasonably well-qualified physician in a similar medical classification would know," Wis. Stat. § 448.30(1), or "[d]etailed technical information that in all probability a patient would not understand," Wis. Stat. § 448.30(2). The Bubbs' complaint bears this out in that it alleges that Dr. Brusky "failed to inform Plaintiff Richard Bubb of additional diagnostic tests or alternate treatment plans."

*925 IV. CONCLUSION
¶ 78 We conclude that Wis. Stat. § 448.30 requires any physician who treats a patient to inform the patient about the availability of all alternate, viable medical modes of treatment, including diagnosis, as well as the benefits and risks of such treatments. The statute contains several reasonable exceptions to this requirement that limit the treating physician's duty to inform under the statute. In this medical malpractice action, the plaintiffs filed a separate and distinct claim grounded in the requirements of § 448.30. They presented sufficient evidence at trial to support such a claim. None of the statutory exceptions apply. Hence, the circuit court's dismissal of the claim at the conclusion of trial evidence was error.
The decision of the court of appeals is reversed and the cause is remanded to the circuit court for further proceedings consistent with this opinion.
¶ 79 ANNETTE KINGSLAND ZIEGLER, J., did not participate.
NOTES
[1] All subsequent references to the Wisconsin Statutes are to the 2007-08 version unless otherwise indicated.
[2] As an emergency medicine physician, Dr. Brusky did not have admitting privileges at St. Agnes Hospital. To admit a patient to the hospital, Dr. Brusky would need to contact a consultant with admitting privileges. According to his testimony, "almost every consultant" has admitting privileges.
[3] The "Aftercare Instructions" advised that a TIA "is a strong warning sign that a stroke could occur. A stroke occurs in about 1/3 of those people who have had a TIA. The TIA you had today shows that you are at risk for a stroke." The instructions also directed Richard to contact Dr. Gu "as soon as possible to make an appointment." Finally, the form instructed Richard to not smoke, take 325 mgs of Aspirin each morning, and call the doctor or go to the hospital if symptoms of a stroke should reoccur.
[4] All subsequent references to Wis JICivil 1023.2 (2009) are to the 2009 version unless otherwise indicated.
[5] The record before this court does not include the Bubbs' proposed special verdict questions. It appears as though those questions were attached to some submission of the Bubbs. We do not know.

However, the late Paul H. Grimstad, attorney for Dr. Brusky, forthrightly acknowledged at oral argument that the special verdict questions contained in Wis JICivil 1023.1 (2006) were submitted by opposing counsel. We appreciate Attorney Grimstad's honesty and integrity in this matter.
[6] All subsequent references to Wis JICivil 1023.1 (2006) are to the 2006 version unless otherwise indicated.
[7] The court's judgment awarded Dr. Brusky and his insurer, Medical Protective Company, $9,689.88; the judgment awarded Dr. Gu and his insurer, Lakeside Neurocare, LMPC, $7,169.12.
[8] Wisconsin Stat. § 448.30.
[9] Dr. Brusky argues that we should review the circuit court's decision under the erroneous exercise of discretion standard because the circuit court is allowed discretion in choosing how to instruct the jury. Indeed, the circuit court has broad discretion in fashioning the form of the jury instructions and special verdict questions submitted to the jury. See State v. Lenarchick, 74 Wis.2d 425, 455, 247 N.W.2d 80 (1976). However, as the court of appeals stated, "This is not a situation where the court rejected certain wording or companion instructions relevant to a particular claim; rather, the court rejected a distinct cause of action." Bubb v. Brusky, 2008 WI App 104, ¶ 17, 313 Wis.2d 187, 756 N.W.2d 584. Because the circuit court completely disposed of the Bubbs' distinct claim for informed consent under Wis. Stat. § 448.30, we do not review its decision as an exercise of discretion. See id.
[10] All subsequent references to Wis JICivil 1023 (2009) are to the 2009 version unless otherwise indicated.
[11] See § 2, ch. 375, Laws of 1981 (effective May 7, 1982).
[12] In other words, "[t]he [common law] obligation to secure informed consent before performing a procedure was premised on the notion that `a person of sound mind has a right to determine, even as against his physician, what is to be done to his body.'" Hannemann v. Boyson, 2005 WI 94, ¶ 34, 282 Wis.2d 664, 698 N.W.2d 714 (quoting Trogun v. Fruchtman, 58 Wis.2d 569, 596, 207 N.W.2d 297 (1973)).
[13] In Trogun, this court set forth the following reasons as to why a treating physician's failure to disclose information regarding a course of medical treatment should not be considered akin to battery: (1) "physicians are invariably acting in good faith and for the benefit of the patient," unlike the typical battery situation where the defendant unlawfully makes physical contact with another; (2) failure to provide information is not likely an intentional act on the part of the physician; (3) "the act complained of in informed consent cases is not within the traditional idea of `contact' or `touching'" contemplated by battery; (4) "a valid question exists with respect to whether a physician's malpractice insurance covers liability for an arguably `criminal' actbattery"; and (5) failing to provide adequate disclosure "do[es] not fit the traditional mold of situations[, such as battery,] wherein punitive damages can be awarded." Trogun, 58 Wis.2d at 598-600, 207 N.W.2d 297.

Additionally, Dean William L. Prosser gives a contemporaneous account of the development in the law of informed consent as a whole:
A considerable number of late cases have involved the doctrine of "informed consent," which concerns the duty of the physician or surgeon to inform the patient of the risk which may be involved in treatment or surgery. The earliest cases treated this as a matter of vitiating the consent, so that there was liability for battery. Beginning with a decision in Kansas in 1960, it began to be recognized that this was really a matter of the standard of professional conduct, since there will be some patients to whom disclosure may be undesirable or even dangerous for success of the treatment or the patient's own welfare; and that what should be done is a matter for professional judgment in the light of the applicable medical standards. Accordingly, the prevailing view now is that the action, regardless of its form, is in reality one for negligence in failing to conform to the proper standard, to be determined on the basis of expert testimony as to what disclosure should be made.
William L. Prosser, Handbook of the Law of Torts § 32 at 165 (4th ed. 1971) (internal footnotes omitted).
[14] See also Hannemann, 282 Wis.2d 664, ¶ 35, 698 N.W.2d 714 ("In Trogun, this court determined that it was no longer appropriate to treat the failure to obtain informed consent as an assault and battery and instead `recognized a legal duty, bottomed upon a negligence theory of liability ....'" (quoting Trogun, 58 Wis.2d at 600, 207 N.W.2d 297)); Johnson v. Kokemoor, 199 Wis.2d 615, 629, 545 N.W.2d 495 (1996) ("The court further developed the doctrine of informed consent in Trogun [], stating for the first time that a plaintiff-patient could bring an informed consent action based on negligence rather than as an intentional tort."); Martin v. Richards, 192 Wis.2d 156, 171, 531 N.W.2d 70 (1995) ("[T]he basis for liability in informed consent cases changed to a negligence theory of liability.").
[15] The Martin court stated that "differential diagnosis" means "`[t]he determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings.'" Martin, 192 Wis.2d at 164 n. 2, 531 N.W.2d 70 (quoting Stedman's Medical Dictionary 428 (25th ed. 1990)).
[16] The jury found no liability for the emergency physician or the consulting physician in relation to the standard of care rendered. Id. at 166, 531 N.W.2d 70.
[17] The court, citing Canterbury v. Spence, 464 F.2d 772, 788 (D.C.Cir.1972), stated "that whenever the determination of what a reasonable person would want to know is open to debate by reasonable people, the issue is one for the jury." Martin, 192 Wis.2d at 172-73, 531 N.W.2d 70.
[18] The supreme court also affirmed the court of appeals' determination that a one to three percent chance of developing an intracranial bleed was not remote given the serious consequences that may result. Id. at 167, 531 N.W.2d 70.
[19] The Johnson court also reaffirmed that the cause element under Wis. Stat. § 448.30 was to be judged objectively by the jury asking "whether a reasonable person in the patient's position would have arrived at a different decision about the treatment ... had he or she been fully informed." Johnson, 199 Wis.2d at 651, 545 N.W.2d 495; see also Scaria, 68 Wis.2d at 14-15, 227 N.W.2d 647; Trogun, 58 Wis.2d at 603-04, 207 N.W.2d 297.
[20] On appeal, Dr. Brusky makes an argument that admission to the hospital was not an alternate mode of treatment available for Richard because Dr. Brusky did not have admitting privileges at St. Agnes Hospital. The fact that Dr. Brusky did not have admitting privileges is irrelevant for two reasons. First, the physician's duty under Wis. Stat. § 448.30 is to inform the patient of the availability of all viable alternatives and allow the patient to make a decision, but the physician is not necessarily required to do what the patient desires. See Martin, 192 Wis.2d at 181, 531 N.W.2d 70 ("The doctor might decide against the alternate treatments or care, he might try to persuade the patient against utilizing them, but he must inform them when a reasonable person would want to know."). Second, emergency physicians often do not have admitting privileges at the hospitals where they work; however, that does not mean that patients treated by emergency physicians cannot be admitted. They can be, as evidenced by Martin, where the emergency physician did not have admitting privileges, but he recommended to the girl and her father that she be admitted, which was done with assistance from a physician with admitting privileges. Id. at 165, 531 N.W.2d 70.
[21] Richard testified at trial as follows:

Q Did anybody, when you left, as you were leaving St. Agnes that night, tell you that you could possibly have the option of staying overnight in the hospital?
A I don't believe so. No.
Q Did anybody say anything to you about the fact that there-that another test could be done to look at your carotid arteries?
A No, no one mentioned that at all.
Q Did anybody tell you that if you had a blockage in your carotid artery, that you could-were at high risk for stroke?
A I don't believe so.
Q Did anybody tell you that this carotid artery could tell you whether you were at risk for stroke?
A No.
Q Would that information have been interesting to you or significant?
A Of course it would have been.
This testimony would not be helpful if it were inconsistent with what a reasonable person under the circumstances would want to know. However, we cannot say on the facts here that this testimony should be disregarded.
[22] Dr. Gu specifically testified that a Doppler ultrasound would have been available either that night or the next day and that the results of the Doppler ultrasound probably would have detected Richard's 90-percent stenosed carotid artery. If the stenosed artery was diagnosed, then Dr. Gu testified that he would have contacted a neurosurgeon so that preparations for surgery could begin. He also stated that if a neurosurgeon was not available at St. Agnes, then Richard would have been transferred to a different hospital.
[23] "[W]henever the determination of what a reasonable person would want to know is open to debate by reasonable people, the issue is one for the jury." Id. at 172-73.
[24] The physician's duty to inform the patient under this section does not require disclosure of:

(1) Information beyond what a reasonably well-qualified physician in a similar medical classification would know.
(2) Detailed technical information that in all probability a patient would not understand.
(3) Risks apparent or known to the patient.
(4) Extremely remote possibilities that might falsely or detrimentally alarm the patient.
(5) Information in emergencies where failure to provide treatment would be more harmful to the patient than treatment.
(6) Information in cases where the patient is incapable of consenting.
Wis. Stat. § 448.30.