Thomas W. JANDRE and Barbara J. Jandre,
Plaintiffs-Respondents,

v.

PHYSICIANS INSURANCE COMPANY OF WISCONSIN and
Therese J. Bullis, M.D., Defendants-Appellants,†

WISCONSIN INJURED PATIENTS AND FAMILIES
COMPENSATION FUND, Defendant-Co-Appellant.

No. 2008AP1972
Thomas W. JANDRE and Barbara J. Jandre,
Plaintiffs,

v.

PHYSICIANS INSURANCE COMPANY OF WISCONSIN and
Therese J. Bullis, M.D., Defendants-Appellants,†

WISCONSIN INJURED PATIENTS AND FAMILIES
COMPENSATION FUND, Defendant-Respondent.

Court of Appeals

 *Submitted on briefs May 7, 2010.*
—*Decided September 28, 2010.*

2010 WI App 136

(Also reported in 792 N.W.2d 558.)

† Petition for Review granted 3-16-11.

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Michael B. Van Sicklen* and *Bree Grossi Wilde* of *Foley & Lardner, LLP*, Milwaukee.

On behalf of the defendant-co-appellant, the cause was submitted on the briefs of *John F. Mayer* and *Ryan R. Graff*, Milwaukee.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *Linda V. Meagher, D. James Weis* and *James M. Fergal* of *Habush, Habush & Rottier S.C.*, Waukesha.

Before Curley, P.J., Fine and Brennan, JJ.

¶ 1. BRENNAN, J. This case arises out of a medical

53

malpractice action. Thomas W. Jandre ("Jandre" unless otherwise noted) and his wife Barbara J. Jandre (collectively, the "Jandres") brought medical negligence and informed consent claims against Dr. Therese J. Bullis and her insurer Physicians Insurance Company of Wisconsin (hereinafter referred to collectively as "PIC") and the Wisconsin Injured Patients and Families Compensation Fund ("the Fund"). The Jandres claimed that Dr. Bullis: (1) negligently diagnosed Jandre with Bell's palsy and (2) failed to inform Jandre of a test to rule out a stroke, which was a condition that Dr. Bullis had included in her differential diagnosis but not in her final diagnosis.[1] The jury decided that Dr. Bullis did not negligently diagnose Jandre with Bell's palsy but was negligent with respect to her duty of informed consent under WIS. STAT. § 448.30 (2007–08).[2] The trial court entered judgment against PIC and the Fund on the jury's informed consent verdict, and apportioned damages between the two. However, the court required PIC alone to pay all of the judgment interest and costs. Two issues have been raised on appeal.

¶ 2. First, PIC and the Fund jointly appeal the trial court's judgment, contending that the informed consent obligation of WIS. STAT. § 448.30 is limited to information about the physician's *final* diagnosis only and that the trial court erred when it applied the

---

[1] *See Martin v. Richards*, 192 Wis. 2d 156, 164 n.2, 531 N.W.2d 70 (1995) (defining a differential diagnosis as " '[t]he determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings' ") (citation omitted); *see also Bubb v. Brusky*, 2009 WI 91, ¶ 58 n.15, 321 Wis. 2d 1, 768 N.W.2d 903.

[2] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

doctrine to Dr. Bullis' differential diagnosis. The Jandres, relying on the "reasonable person" test of *Martin v. Richards*, 192 Wis. 2d 156, 531 N.W.2d 70 (1995), and *Bubb v. Brusky*, 2009 WI 91, 321 Wis. 2d 1, 768 N.W.2d 903, argue that § 448.30 does not limit a physician's duty of informed consent to information about conditions in the final diagnosis. Rather, they assert that a physician is required to disclose information about all alternate, viable medical modes of treatment, including diagnosis, that a reasonable person in the patient's position would want to know in order to make an intelligent decision with respect to the choices of treatment or diagnosis. *See Martin*, 192 Wis. 2d at 176; *see also Bubb*, 321 Wis. 2d 1, ¶ 71 ("Th[e] answer is dictated 'by what a reasonable person under the circumstances then existing would want to know.' ") (citing *Martin*, 192 Wis. 2d at 174).

¶ 3. We agree with the Jandres and affirm on this first issue because well-established precedent in Wisconsin makes it clear that the outcome of each case depends on its particular circumstances. Consequently, the scope of the information a physician is required to disclose is not limited to information regarding the final condition diagnosed, but instead, a physician must disclose "what . . . a reasonable person in the patient's position [would] want to know in order to make an intelligent decision with respect to the choices of treatment or diagnosis." *See Martin*, 192 Wis. 2d at 176. Here, Dr. Bullis first diagnosed Jandre as either having some kind of stroke or Bell's palsy and later formed a final diagnosis of Bell's palsy. As treatment, she recommended Jandre go home and wait for the Bell's palsy to resolve because Bell's palsy generally resolves on its own. A stroke, on the other hand, can kill or seriously injure a patient. There is no test for Bell's palsy, but

there is a test, a carotid ultrasound, which can detect a mini-stroke or full-blown ischemic stroke. We conclude that under these circumstances, Jandre, in order "to make an intelligent decision with respect to the choices of treatment or diagnosis" would want to know if he was having a stroke. *See id.* at 175. Accordingly, Wis. Stat. § 448.30 required Dr. Bullis to inform Jandre of the test.

¶ 4. Second, PIC alone appeals the trial court's order requiring it to pay all of the judgment interest and costs. PIC argues that the Fund should be responsible for paying its *pro rata* share of the taxable costs and interest based on its share of the judgment. We conclude that the plain meaning of Wis. Admin. Code § INS 17.35 (Mar. 2010) and Wis. Stat. ch. 655 obligate PIC to pay all of the judgment interest in this case. Further, we conclude that PIC waived the issue of who should pay judgment costs. Consequently, we affirm on the second issue as well.

## BACKGROUND

¶ 5. On June 13, 2003, Jandre was at work and driving to a job site when he drank some coffee and it came out through his nose. He was drooling, his speech was slurred, his face drooped on the left side, he was unsteady, dizzy and his legs felt weak. His co-workers took him to the St. Joseph's Hospital West Bend emergency room. Jandre told the emergency room nurse his complaints, and his co-workers reported their observations of Jandre's symptoms. The nurse noted in Jandre's chart that he complained of left facial weakness, slurred speech and dizziness that lasted approximately twenty-plus minutes. The nurse noted that she observed that the left side of Jandre's face drooped.

56

¶ 6. Jandre was evaluated at the emergency room by Dr. Bullis. Dr. Bullis read Jandre's chart, including the nurse's notes, took a medical, social and family history from Jandre and performed a physical examination. Dr. Bullis testified that she observed left-side facial weakness and mild slurred speech. She made a differential diagnosis—which she testified was a "list" of what she was "evaluating the patient for"—of some kind of stroke or Bell's palsy.

¶ 7. The testimony at trial established that there are two types of stroke: (1) ischemic, during which the blood supply to the brain is cut off, most commonly due to blockage in the carotid artery in the neck, and (2) hemorrhagic, during which there is bleeding in the tissue of the brain. There are also two types of temporary blockages, or "mini-strokes," a transient ischemic accident ("TIA") and a reversible ischemic neurological deficit ("RIND"), both of which are warning signs of a "full blown" stroke, which can cause death or permanent injury. A TIA is temporary and does not usually result in long term damage. A RIND is similar to a TIA but lasts more than twenty-four hours. Dr. Bullis ordered a CT scan for Jandre, which can determine whether a patient suffered from a hemorrhagic stroke, a brain bleed or a tumor. The results of the CT scan were normal. Dr. Bullis conceded that the CT scan would not detect an ischemic stroke. Although there is a test to determine whether a patient suffered an ischemic stroke—a carotid ultrasound, which was available at St. Joseph's Hospital—Dr. Bullis did not order one.

¶ 8. The trial testimony also established that Bell's palsy is an inflammation of the seventh cranial nerve, which is responsible for facial movement. It is not life-threatening, and the majority of people who

suffer from Bell's palsy recover after several weeks or months without any further symptoms. There is no test for Bell's palsy. It is diagnosed by ruling out everything else.

¶ 9. Dr. Bullis' final diagnosis was that Jandre had a mild form of Bell's palsy. She concluded Jandre was not having a stroke based on the fact that the CT scan did not reveal a hemorrhagic stroke, and her physical exam did not reveal an ischemic stroke. However, Dr. Bullis testified that she did not order the carotid ultrasound test to rule out ischemic stroke. She testified that instead of the ultrasound she listened to Jandre's carotid arteries to determine if she heard a whooshing sound, which is indicative of ischemic stroke, and heard nothing. But she admitted that listening to the carotid arteries is a "very, very poor screening test for [determining] what shape the carotid[] [arteries] are in," and that if the carotid arteries are severely blocked, up to ninety-five percent or so, a physician listening to the carotid arteries will not likely hear the whooshing sound. There was testimony that the best test for evaluating the carotid arteries is the carotid ultrasound. Dr. Bullis acknowledged that not all of Jandre's symptoms fit the Bell's palsy diagnosis and that some of the symptoms were indicative of a stroke, but Bell's palsy was her final diagnosis.

¶ 10. Accordingly, Dr. Bullis told Jandre he had a very mild form of Bell's palsy. She told him if he developed other weakness or numbness or any other symptoms not associated with taste or hearing, he should seek immediate medical attention. She pre-scribed medicine for Bell's palsy and told him to check with his physician in one week or sooner if any concern-ing symptoms developed. Her diagnosis of Bell's palsy

58

and her treatment recommendations were documented in Jandre's medical records.

¶ 11. Dr. Bullis did not tell Jandre that he had an atypical presentation of Bell's palsy or that his symptoms were also consistent with a stroke. Although Dr. Bullis testified that she told Jandre what Bell's palsy was and explained it was not a stroke, Jandre's medical records document only that Dr. Bullis told him he had Bell's palsy and explained that final diagnosis. Jandre denied that Dr. Bullis mentioned the possibility that he was suffering from a stroke, either hemorrhagic or ischemic. Further, Jandre claimed that Dr. Bullis did not explain what a TIA or RIND were or that they could be warning signs of future stroke, which could result in death or disability. Jandre testified that Dr. Bullis did not tell him that there was a test called a carotid ultrasound that he could take to rule out ischemic stroke.

¶ 12. Three days after the emergency room visit, Jandre went to see a physician at the Fond du Lac clinic for a follow-up appointment. That physician's note indicated resolving Bell's palsy.

¶ 13. Eleven days later, on June 24, 2003, Jandre suffered a massive stroke. A carotid ultrasound performed at St. Luke's Hospital revealed that Jandre's right internal carotid artery was ninety-five percent blocked. Two expert witnesses, both Jandre's treating physicians, testified at trial that if they had been called on June 13, 2003, the day of the emergency room examination, they would have ordered a carotid ultrasound. Both physicians testified that on June 13, 2003, Jandre had experienced a TIA or RIND and had a carotid ultrasound been done that day, it would have revealed a ninety-five percent blockage in the right internal carotid artery. They testified that the blockage

59

could have been treated by surgery, which would have significantly reduced the likelihood of Jandre suffering a stroke eleven days later.[3]

¶ 14. On June 14, 2004, the Jandres filed suit against Dr. Bullis, PIC and the Fund, alleging that Dr. Bullis negligently: (1) diagnosed Jandre's condition and (2) failed to disclose information necessary for Jandre to make an informed decision with respect to his treatment. PIC filed a motion for partial summary judgment on the informed consent claim, which the trial court denied. PIC moved for reconsideration, and the trial court also denied that motion. At the jury instruction conference prior to trial, PIC and the Fund objected to instructing the jury and submitting a verdict question on the informed consent claim. The trial court denied their motions and submitted the informed consent questions to the jury. The case proceeded to trial in February 2008, on both the negligent diagnosis claim and the informed consent claim. The jury found that Dr. Bullis was not negligent in her diagnosis but was negligent with regard to her duty of informed consent. PIC and the Fund filed motions after verdict

---

[3] The parties disagree as to whether the stroke Jandre suffered was ischemic or hemorrhagic. PIC argues that the stroke was hemorrhagic but provides no citation to the record to support its position. Jandre, on the other hand, argues that the stroke was ischemic, and points to the testimony of Dr. Bullis in which she testified as follows: "Q: Okay. And nobody in this case says that there was a hemorrhagic stroke, right? A: That is correct." Additionally, Jandre's expert testified that the source of the stroke was a ninety-five percent narrowing of the carotid artery. And the trial testimony establishes that an ischemic stroke is often caused by a blocked carotid artery. However, regardless of whether the stroke was ischemic or hemorrhagic, the ultimate issue is whether Jandre should have been advised that a carotid ultrasound was available.

requesting reversal of the jury verdict based on insufficient evidence or, in the alternative, a new trial because the trial court erred in submitting the question of informed consent to the jury. The court denied those motions on April 28, 2008.

¶ 15. The jury awarded damages of $1,653,060 to Thomas Jandre and $158,125 to Barbara Jandre. The parties stipulated that in addition to the jury's verdict Thomas Jandre would receive an additional $200,000 for past medical expenses, for a total of $1,853,060. The trial court also awarded the Jandres taxable costs, disbursements, statutory attorney fees and post-verdict interest. The court allocated the damages by ordering PIC, as the primary insurer, to pay $1,000,000 to Thomas Jandre and ordered the Fund to pay the remaining $853,060 to Thomas Jandre and the full $158,125 to Barbara Jandre. The court also ordered PIC to pay all of the taxable costs, disbursements, statutory attorney fees and post-verdict interest on the total amount of the judgment. PIC and the Fund appeal.

¶ 16. Following the notice of appeal, PIC petitioned to bypass the court of appeals, pursuant to Wis. Stat. § 808.05(1) and Wis. Stat. Rule 809.60, and to consolidate Jandre's case with *Bubb* because both cases "rais[ed] the same central issue." In the alternative, PIC asked for a stay from this court to await the outcome of *Bubb*. We granted the stay, and the Wisconsin Supreme Court released its decision in *Bubb* on July 24, 2009. The decision reversed the court of appeals and trial court decision and concluded that the informed consent question should have been submitted to the jury in that case. *Id.*, 321 Wis. 2d 1, ¶¶ 3–4, 78. We reinstated the briefing schedule in this matter after the *Bubb* decision was released.

61

## STANDARD OF REVIEW

¶ 17. PIC and the Fund challenge the trial court's construction of WIS. STAT. § 448.30, which sets forth the duty of informed consent, and PIC alone challenges the trial court's construction of WIS. ADMIN. CODE § INS 17.35 and WIS. STAT. ch. 655, which is the basis for the trial court's order that PIC pay all of the judgment interest and costs. Construction of both statutes and administrative regulations are matters of law that we review *de novo. See Rechsteiner v. Hazelden,* 2008 WI 97, ¶ 26, 313 Wis. 2d 542, 753 N.W.2d 496; *Williams v. Integrated Cmty. Servs.,* 2007 WI App 159, ¶ 12, 303 Wis. 2d 697, 736 N.W.2d 226. "When construing administrative regulations, we use the same rules of interpretation that we apply to statutes." *Williams,* 303 Wis. 2d 697, ¶ 12. "The goal of statutory interpretation is to ascertain and give effect to the intent of the legislature." *Lake City Corp. v. City of Mequon,* 207 Wis. 2d 155, 162, 558 N.W.2d 100 (1997). We give the words of the statute their plain meaning. *Id.* Only if we find the statute ambiguous do we look beyond the statute's plain language to determine the legislature's intent. *Id.* at 163.

## DISCUSSION

### I. Informed Consent

¶ 18. The physician's duty of informed consent is set forth in WIS. STAT. § 448.30 and has been well developed in three principal cases: *Scaria v. St. Paul Fire & Marine Insurance Co.,* 68 Wis. 2d 1, 227 N.W.2d 647 (1975), *Martin,* and, very recently, *Bubb.* The duty of informed consent was described by the Wisconsin

62

Supreme Court in *Bubb*, thus: "We conclude that WIS. STAT. § 448.30 requires any physician who treats a patient to inform the patient about the availability of all alternate, viable medical modes of treatment, including diagnosis, as well as the benefits and risks of such treatments." *Bubb*, 321 Wis. 2d 1, ¶ 3. While acknowledging that the scope of the duty can be sometimes difficult to determine, the court cited with approval the test set forth in *Martin*, stating that the extent of the duty to disclose " 'is driven . . . by what a reasonable person under the circumstances then existing would want to know, i.e., *what is reasonably necessary for a reasonable person to make an intelligent decision with respect to the choices of treatment or diagnosis.*' " *See Bubb*, 321 Wis. 2d 1, ¶ 62 (citing *Martin*, 192 Wis. 2d at 174) (ellipses and emphasis in *Bubb*).

¶ 19. PIC[4] acknowledges this well-settled law but attempts to distinguish *Bubb* and *Martin* from this case by arguing that while *Bubb* and *Martin* apply the duty of informed consent to diagnostic tools, "those cases do not hold that the duty requires a doctor to provide information about diagnostic tools or treatments for conditions unrelated to" the condition in the final diagnosis. We conclude that PIC mischaracterizes the facts and holding in *Martin* and ignores the carefully elucidated informed consent analysis and standard articulated in both *Martin* and *Bubb*. Further, PIC's reliance on *Kuklinski v. Rodriguez*, 203 Wis. 2d 324, 552 N.W.2d 869 (Ct. App. 1996), is misplaced, as we address below. Consequently, we affirm the trial court.

---

[4] Because both PIC and the Fund advance the same arguments against application of the duty to inform, for ease of reference we will refer to appellants' arguments jointly as PIC's.

¶ 20. First, we note some of the history of the development of the doctrine of informed consent in Wisconsin, which was extensively noted in both *Martin* and *Bubb* and is important to analyzing Dr. Bullis' duty here. The duty of informed consent is based on an objective focus: namely, what a *patient* reasonably needs to know to make an intelligent decision. This focus, as opposed to focusing on the medical community's accepted practice, was first established in *Scaria*, reiterated in *Martin* twenty years later and in *Bubb* just recently. It bears repeating here because the objective focus is at the heart of understanding the supreme court's holdings on the scope of the duty of informed consent.

¶ 21. In *Scaria*, the Wisconsin Supreme Court rejected an informed consent jury instruction because it limited the duty to disclose to only " 'those disclosures which physicians and surgeons of good standing would make under the same or similar circumstances.' " *Id.*, 68 Wis. 2d at 12. Instead, the court said the focus should be on the "informational needs of a patient." *Id.* Recognizing the patient's lack of medical knowledge, the court concluded that the patient had a right to be informed by the physician of the "inherent and potential risks" of the "proposed medical treatment or procedure." *Id.*

¶ 22. In response to *Scaria*, in 1982, the Wisconsin legislature enacted Wis. Stat. § 448.30 to codify the common law informed consent doctrine. *Martin*, 192 Wis. 2d at 174; *Bubb*, 321 Wis. 2d 1, ¶ 57. The legislature also incorporated limitations on the duty that *Scaria* had recognized. *See Bubb*, 321 Wis. 2d 1, ¶ 57. Section 448.30 states:

**Information on alternate modes of treatment.**

Any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments. The physician's duty to inform the patient under this section does not require disclosure of:

(1) Information beyond what a reasonably well-qualified physician in a similar medical classification would know.

(2) Detailed technical information that in all probability a patient would not understand.

(3) Risks apparent or known to the patient.

(4) Extremely remote possibilities that might falsely or detrimentally alarm the patient.

(5) Information in emergencies where failure to provide treatment would be more harmful to the patient than treatment.

(6) Information in cases where the patient is incapable of consenting.

¶ 23. The extent of the duty of informed consent was again addressed by the Wisconsin Supreme Court in *Martin*, thirteen years after the passage of WIS. STAT. § 448.30. Martin, a fourteen-year-old girl, ran into the back of a truck while she was riding her bike. *Id.*, 192 Wis. 2d at 163. She was taken to the emergency room at Fort Atkinson Memorial Hospital and treated by a physician, who made a differential diagnosis of " 'concussion, contusion, and the possibility of intracranial bleeding.' " *Id.* at 162, 164. The physician's final diagnosis was concussion. *Id.* at 164. The physician's treatment recommendation was to send Martin home with a responsible adult or admit her to the hospital. *Id.*

However, the physician did not tell the Martins that the Fort Atkinson hospital had a CT scanner, which had the ability to diagnose serious head injuries, nor did he tell the Martins that, if intracranial bleeding should occur, the Fort Atkinson hospital lacked a neurosurgeon and would have to transfer Martin to a hospital in Madison. *Id.* at 164. Three hours after the physician's diagnosis and treatment, Martin developed intracranial bleeding and sustained serious, permanent injuries. *Id.* at 162.

¶ 24. The supreme court held in *Martin* that WIS. STAT. § 448.30 required the treating physician to inform the Martins about: (1) a diagnostic test to rule out intracranial bleeding and (2) the unavailability of an onsite neurosurgeon at the hospital, who would be necessary should intracranial bleeding occur. *Martin*, 192 Wis. 2d at 182. The court in *Martin* construed § 448.30's reference to "all alternate, viable medical modes of treatment" to include: (1) diagnostic procedures, *see Martin*, 192 Wis. 2d at 175; (2) non-invasive procedures, *see id.* at 176; and (3) in some cases, information on conditions with a small risk of complication if the risk involves severe consequences and the information is material to the patient's decision on a treatment recommendation, *see id.* at 167–68.

¶ 25. While conceding the description of the duty of informed consent set forth in *Martin* and the duty's application to diagnostic tools, PIC attempts to avoid the application of the *Martin* holding here, by arguing that *Martin* only requires a physician to inform a patient about information related to the physician's final diagnosis. PIC tries to distinguish *Martin* on its facts by arguing that the treating physician's final diagnosis was really "only one condition, ranging from a simple concussion to a concussion involving intracranial bleeding." Therefore, PIC argues, that the supreme

court's holding that the treating physician had a duty to inform the Martins of the test for intracranial bleeding was simply an acknowledgment of the duty to inform about the final diagnosis only.

¶ 26. PIC misstates the facts in *Martin*. The physician's final diagnosis was that Martin suffered a concussion, not that Martin suffered both a concussion and intracranial bleeding. *See id.* at 164 ("Based upon the results of these tests, [the physician] ultimately diagnosed . . . Martin as having a concussion."). The physician's differential diagnosis was " 'concussion, contusion, and the possibility of intracranial bleeding.' " *Id.* While it is true that the supreme court recognized that the physician could not totally rule out intracranial bleeding, *see id.* at 178, intracranial bleeding was not included in the physician's final diagnosis, *see id.* at 164. In that respect, the facts in *Martin* are identical to those here. Like the physician in *Martin* did not rule out intracranial bleeding, Dr. Bullis did not rule out ischemic stroke. Indeed, Dr. Bullis could not rule out an ischemic stroke because she—like the physician in *Martin*—did not perform the test necessary to do so. Contrary to PIC's assertion, the *Martin* holding directly applies here.

¶ 27. Similarly, PIC attempts to avoid the application of the holding in *Bubb*. *Bubb* reasserted the *Martin* standard for the scope of the duty of informed consent. *See Bubb*, 321 Wis. 2d 1, ¶ 3. In *Bubb*, the physician's diagnosis was a TIA, which often displays "stroke-like symptoms." *Id.*, ¶ 7. One of the patient's experts testified that "[u]nlike a stroke, where symptoms are permanent, TIA symptoms frequently resolve themselves within 24 hours." *Id.* The physician's treat-

ment recommendation was discharge from the hospital with instructions for follow-up care, but he failed to tell the patient of the alternative—admission to the hospital with further diagnostic testing. *Id.*, ¶ 71. Two days later the patient suffered a "large-scale stroke." *Id.*, ¶ 11.

¶ 28. The court in *Bubb* held that because "a reasonable person in [the patient]'s condition would have wanted to know about the alternative of admission with further diagnostic testing" there was credible evidence in the record for the jury to determine that the physician breached his duty of informed consent. *Id.*, ¶ 72. It is true, as PIC states, that *Bubb* did not involve a differential diagnosis. However, the significance of *Bubb*, and the point missed by PIC's argument about its inapplicability here, is that the supreme court reaffirmed that the scope of a physician's duty to inform is delineated not by whether the information relates to either the physician's differential or final diagnosis, but by whether a reasonable person would want to know the information in order to make an intelligent decision about the treatment being recommended.

█

¶ 29. Dr. Bullis included two conditions in her differential diagnosis—some kind of stroke or Bell's palsy. Her final diagnosis was Bell's palsy. Her recommended treatment was for Jandre to go home and see his regular physician in a week unless the symptoms worsened. Bell's palsy, a virus, resolves on its own over time and is not life threatening. A stroke, on the other hand, can severely incapacitate or kill. Here, like the patient in *Martin*, Jandre was at risk for a condition with severe consequences. Consequently, a reasonable person in Jandre's position would want to know that there is a test to rule out stroke in order to evaluate Dr.

Bullis' diagnosis and recommended treatment for Bell's palsy. Therefore, the availability of a test to rule out stroke was information that Dr. Bullis should have disclosed under the statute.

¶ 30. PIC wants us to adopt a bright line rule, requiring physicians only to disclose information relating to the final diagnosis. However, the supreme court has explicitly rejected other attempts to create bright line rules, concluding that "[t]he prudent patient standard adopted by Wisconsin in *Scaria* is incompatible with . . . bright line rule[s]." *See Johnson v. Kokemoor*, 199 Wis. 2d 615, 639, 545 N.W.2d 495 (1996). The supreme court has been clear and consistent in rejecting attempts to limit the information a physician must disclose under WIS. STAT. § 448.30 and in reiterating the objective, prudent patient standard.

¶ 31. PIC also relies on *Kuklinski*, claiming that in *Kuklinski* we limited the duty of informed consent to only those conditions within the physician's final diagnosis. PIC then applies this purported "holding" to the facts of this case and argues that "Dr. Bullis only had a duty to provide information based on what she diagnosed at that time—namely[,] that . . . Jandre was suffering from Bell's palsy," and therefore had no duty to inform about the carotid ultrasound test.

¶ 32. PIC misrepresents the holding of *Kuklinski*. In *Kuklinski*, we considered the narrow question of whether there was sufficient evidence to support the jury's finding that the physician was not negligent with respect to the failure-to-inform issue. *See id.*, 203 Wis. 2d at 327, 331. We never addressed whether the doctrine of informed consent applied to conditions other than the final condition diagnosed. We cited with approval the informed consent standard from *Martin*

69

that "Wisconsin law 'requires that a physician disclose information necessary for a reasonable person to make an intelligent decision with respect to the choices of treatment or diagnosis,' " *see Kuklinski*, 203 Wis. 2d at 329 (citation omitted).

¶ 33. The facts and holding in *Kuklinski* are distinguishable from those here. In *Kuklinski*, the facts regarding what the physician knew at the time were in dispute and were ultimately resolved by the jury. *Id.* at 333–34. We concluded that there was sufficient evidence to support the jury's determination. *Id.* at 331, 334 ("Given what the jury could reasonably conclude [the physician] knew at the time that the Kuklinskis claim that he should have discussed with them the availability of a CT scan, the jury's finding that [the physician] was not negligent on the informed-consent issue must be upheld."). Here, Dr. Bullis does not dispute having sufficient information to know that Jandre might have suffered a stroke. In fact, Dr. Bullis listed stroke as part of her differential diagnosis. And she acknowledged that a carotid ultrasound would have detected an ischemic stroke.

¶ 34. As the supreme court recently noted in *Bubb*, the standards of *Scaria*, *Martin* and *Johnson* "continue to guide our interpretation of Wis. Stat. § 448.30, and we see no reason to depart from these standards in interpreting the statute in the present case." *See Bubb*, 321 Wis. 2d 1, ¶¶ 67–68. "[Section] 448.30 requires any physician who treats a patient to inform the patient about the availability of all alternate, viable medical modes of treatment, including diagnosis." *Bubb*, 321 Wis. 2d 1, ¶ 3. Consequently, we apply that standard here.

¶ 35. Finally, we reject PIC's attempt to persuade us that requiring physicians to inform patients of tests

like the carotid ultrasound puts physicians in an impossible position because it "require[s] doctors to provide information about diagnostic tools and treatments for *any possible condition* from which the defendant may suffer *at some point in the future.*" (Emphasis added.) PIC overstates the informed consent obligations set forth in WIS. STAT. § 448.30 and the statute's interpretive case law. We are not holding that Dr. Bullis had to provide information about *any possible condition* or that she had to provide information about conditions Jandre might suffer *at some point in the future.* Rather, we conclude that Dr. Bullis was required to inform Jandre about a test to rule out a condition she thought he was possibly suffering from, and which she did not rule out.

¶ 36. We agree with the supreme court in *Bubb* that, in general, there may be legitimate concerns about imposing requirements on physicians that are too burdensome. However, those concerns are "greatly alleviated by the express language of the statute, placing limits on the physician's duty of disclosure." *See id.*, 321 Wis. 2d 1, ¶ 75. And, more importantly, those concerns are not implicated here. We note that none of the statutory limitations of WIS. STAT. § 448.30 apply here. For example, the facts of this case: (1) do not require Dr. Bullis to have specialized knowledge that she did not already possess; (2) do not require Dr. Bullis to provide Jandre with information that is too technical for Jandre to understand; and (3) do not require Dr. Bullis to provide Jandre with information about a condition that is only a remote possibility. *See* § 448.30.

¶ 37. Because WIS. STAT. § 448.30 requires a physician to inform a patient of "all alternate, viable medical modes of treatment, including diagnosis" that " 'a reasonable person in the patient's position want to

71

know in order to make an intelligent decision with respect to the choices of treatment or diagnosis,' " *see Bubb*, 321 Wis. 2d 1, ¶¶ 3, 27 (citation omitted), and because a reasonable person in Jandre's position would want to know of the availability of a carotid ultrasound test to intelligently determine if he should follow the treatment recommendation made by Dr. Bullis, we conclude that the jury was properly asked to determine whether Dr. Bullis' failure to inform was negligent under § 448.30.

## II. Judgment Interest and Costs

■

¶ 38. PIC also appeals the trial court's order requiring it to pay all of the judgment costs and interest, arguing that WIS. STAT. §§ 655.24 and 655.27 only require PIC "to pay its pro rata share of attorney's fees, costs and interest on the portion of the judgment for which it was liable" or "about half" of the total judgment. PIC argues that our decision in *Herman v. Milwaukee Children's Hospital*, 121 Wis. 2d 531, 361 N.W.2d 297 (Ct. App. 1984), "squarely decided" that the Fund is responsible for judgment interest and costs in excess of the policy limits.

¶ 39. The Fund argues, and we agree, that PIC waived any objection to the order for costs. As to the judgment interest, the Fund argues that WIS. STAT. § 655.24(2)(a)3. and WIS. ADMIN. CODE §§ INS 17.35(1),(2)(e) obligate the primary insurer, in this case PIC, to provide coverage for all of the judgment interest. The Fund contends that *Herman* is distinguishable because some of the statutes involved in the case were repealed and, more importantly, because § 655.24(2)(a)3. and § INS 17.35 were enacted six years after *Herman*.

*See* 1989 Wis. Act 187, § 20g. (creating § 655.24(2)(a)3.). Finally, the Fund argues that putting the obligation to pay all judgment interest on the primary insurer is consistent with the public policy behind the legislature's creation of the Fund and WIS. STAT. ch. 655.

¶ 40. First, we address the trial court's imposition of costs. PIC failed to raise any objection to the costs order before the trial court. In fact, PIC's counsel told the trial court: "[w]ith respect to the costs only, I do agree that those are the responsibility of the primary carrier under [WIS. STAT. ch.] 655." On appeal, PIC does not dispute this nor does PIC explain why on appeal it has completely changed its position. "Generally, arguments raised for the first time on appeal are deemed waived." *Kolupar v. Wilde Pontiac Cadillac, Inc.*, 2007 WI 98, ¶ 23, 303 Wis. 2d 258, 735 N.W.2d 93. We therefore conclude that PIC has waived the costs issue.

¶ 41. With regard to the trial court's order that PIC pay the judgment interest in its entirety, we affirm the trial court. The Fund, as a statutory creation, *see* WIS. STAT. § 655.27(1),[5] has only those powers and responsibilities conveyed to it by statute, *see Wisconsin Department of Taxation v. Blatz Brewing Co.*, 12 Wis. 2d 615, 628, 108 N.W.2d 319 (1961). Nowhere in WIS. STAT. ch. 655 is the Fund obligated to pay judgment interest. The Fund *is* obligated under WIS. STAT. § 655.27(5)(d) to

---

[5] WISCONSIN STAT. § 655.27 states in relevant part:

**Injured patients and families compensation fund. (1)** FUND. There is created an injured patients and families compensation fund for the purpose of paying that portion of a medical malpractice claim which is in excess of the limits expressed in [WIS. STAT. §] 655.23(4) or the maximum liability limit for which the health care provider is insured, whichever limit is greater.

pay claims for judgments or settlements in excess of the statutory limits or the primary insurer's coverage, whichever is greater. Section 655.27(5)(d) states, in relevant part:

> A person who has recovered a final judgment or a settlement approved by the board of governors against a health care provider, or an employee of a health care provider, that has coverage under the [F]und may file a claim with the board of governors to recover that portion of such judgment or settlement *which is in excess of the limits* in [WIS. STAT. §] *655.23(4) or the maximum liability limit for which the health care provider is insured, whichever limit is greater.*

(Emphasis added.)

¶ 42. The legislature did, however, in WIS. STAT. § 655.24, empower the board of governors to determine how interest would be paid. The statute states in relevant part:

> **Insurance policy forms.**
>
> . . . .
>
> **(2)** Every policy issued under this chapter shall be deemed conclusively to provide all of the following:
>
> (a) That the insurer agrees to pay in full all of the following:
>
> . . . .
>
> 3. Any portion or all of the interest, *as determined by the board of governors,* on an amount recovered against the insured under this chapter for which the insured is liable . . . .

(Emphasis added.) Accordingly, the board of governors enacted WIS. ADMIN. CODE § INS 17.35(2)(e), which requires all health care liability insurance policies to

provide "[c]overage for supplemental payments in addition to the indemnity limits, including . . . interest." The parties do not dispute that PIC's policy conformed to the statutory requirements that it cover "interest" "for supplemental payments" "in addition to the indemnity limits." *See id.* Therefore, PIC is liable for all interest on the judgment, including that portion of the judgment to be paid by the Fund.

¶ 43. PIC's reliance on *Herman* is misplaced. PIC is correct that in *Herman,* we construed Wis. Stat. § 655.27 (1983–84) to require the Fund to pay all of the judgment interest (and costs, which are not at issue here). *See Herman,* 121 Wis. 2d at 557–58. But PIC ignores the basis for our holding in *Herman,* which was that the health care provider there was not obligated to incur liability over the limits set in Wis. Stat. § 655.23(5) (1983–84). *See Herman,* 121 Wis. 2d at 557–58. Here, PIC *was obligated* by Wis. Stat. § 655.24(2)(a)3. and Wis. Admin. Code § Ins 17.35 to pay interest on supplemental payments over the policy limits. It is undisputed by the parties that § 655.24(2)(a)3. and § Ins 17.35 were enacted *after Herman. See* 1989 Wis. Act 187, § 20g. (creating § 655.24(2)(a)3.). Based on § 655.24(2)(a)3. and § INS 17.35, the Fund's obligation to cover that amount of the judgment in excess of the policy or statutory limit is not triggered until the primary insurer's policy limits and supplemental payments, including interest, have been exhausted, which they were not here.

*By the Court.*—Judgment affirmed.

¶ 44. FINE, J. (*concurring*). I join the Majority opinion. As seen from its cogent analysis of existing law in connection with the informed-consent issue, its con-

clusion that we must affirm is compelled by precedent. I write separately, however, to suggest that controlling case law has gone way beyond the governing statute and the decision from which that statute sprang, and has made physicians essentially strictly liable for bad results even though they were not negligent in the care and treatment of their patients. Thus, the jury in this case specifically found that Therese Bullis, M.D., was not "negligent with respect to her care and treatment of" her patient. Under the trial court's instructions, this encompassed Bullis's diagnosis of Thomas Jandre's condition.

¶ 45. We start, as we must, with the statute. As material, WIS. STAT. § 448.30, provides: "Any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments." As the Majority notes in paragraph 22, this section codified the duty-to-disclose common law recognized by *Scaria v. St. Paul Fire & Marine Insurance Co.*, 68 Wis. 2d 1, 13, 227 N.W.2d 647, 654 (1975). *See Martin v. Richards*, 192 Wis. 2d 156, 174–175, 531 N.W.2d 70, 78 (1995). Although, § 448.30 directs the physician to tell the patient about "modes of treatment and about the benefits and risks of these treatments," it does not direct that the physician tell the patient about the full spectrum of possible diagnoses that might, in retrospect, be consistent with the patient's symptoms.

¶ 46. Significantly, *Scaria* was a case where the physician did not disclose to the patient the risk of the *procedure* the physician asked the patient to undergo; *the case did not concern whether the physician had a duty to discuss with the patient possible diagnoses that might also be consistent with the patient's symptoms. Scaria*, 68 Wis. 2d at 5–9, 227 N.W.2d at 650–651.

*Scaria* noted the common-law rule: "[T]he duty of the doctor is to make such disclosures as appear reasonably necessary under circumstances then existing to enable a reasonable person under the same or similar circumstances confronting the patient at the time of disclosure to intelligently exercise his *right to consent or to refuse the treatment or procedure proposed." Id.*, 68 Wis. 2d at 13, 227 N.W.2d at 654 (emphasis added). That the duty of informed consent was limited to whether the physician explained the risks and benefits of a proposed treatment is highlighted by *Trogun v. Fruchtman*, 58 Wis. 2d 569, 207 N.W.2d 297 (1973), which, as we see, was decided two years before *Scaria*. *Trogun* explained the concept of "informed consent": " 'A considerable number of late cases have involved the doctrine of 'informed consent,' which concerns the duty of the physician or surgeon to inform the patient of the risk which may be involved in treatment or surgery.' " *Id.*, 58 Wis. 2d at 598, 207 N.W.2d at 312 (quoting "Prosser, *Law of Torts* (4th ed. 1971), p. 165").

¶ 47. So, where did the physician's duty to discuss with the patient the range of possible diagnoses come from because it is in neither the statute nor *Scaria* from which the statute was derived? Well, as the Majority notes in paragraph 8, it came from the post-*Scaria* cases. *See, e.g., Bubb v. Brusky*, 2009 WI 91, ¶ 3, 321 Wis. 2d 1, 4, 768 N.W.2d 903, 905 ("We conclude that Wis. Stat. § 448.30 requires any physician who treats a patient to inform the patient about the availability of all alternate, viable medical modes of treatment, including diagnosis, as well as the benefits and risks of such treatments."). Of course, as we have seen, there is nothing in either *Scaria* or § 448.30 that extends the informed-consent duty to encompass the range of possible diagnoses. This post-*Scaria* extension in violation

77

of the clear language in § 448.30 shifts medical-assessment judgment from the physician to the *patient* and leads to two no-win alternatives framed by the following question: "Must the physician in obeisance to the *patient's medical judgment* then do *everything* the patient wants done?"

¶ 48. If the answer to this question is "yes," there will be no ceiling to the already rocketing health-care costs because of the plethora of unnecessary tests and procedures such an answer will spawn. This surely would be contrary to the legislature's recognition of the dangers to the financial integrity of our health-care system by "the prescription of elaborate 'defensive' medical procedures." *See Finnegan ex rel. Skoglind v. Wisconsin Patients Compensation Fund*, 2003 WI 98, ¶ 21, 263 Wis. 2d 574, 586–587, 666 N.W.2d 797, 803–804 (acknowledging legislature's reason for creating WIS. STAT. ch. 655) (quoted source omitted). If the answer to this question is "no," then, under *Bubb* and its post-*Scaria* precursors, the issue of whether the physician will be liable under § 448.30 turns on whether one of the undisclosed possible diagnoses will be seen in retrospect as the one the physician should have made, *despite the fact that the physician's actual diagnosis was not negligent.* Indeed, even though Dr. Bullis was not "negligent with respect to her care and treatment of" her patient—that is, her diagnosis of Jandre's condition, as explained by the trial court's instructions to the jury—the Majority, in paragraphs 26, 29, and 35, conflates the informed-consent issue with *its* view of what Bullis's diagnosis *should have been.* I do not fault the Majority, however, because its analysis is consistent with the post-*Scaria* cases to which we are bound.

¶ 49. When a physician is not negligent in his or her diagnosis and fully explains to the patient the risks

and benefits of treatment alternatives that are *consistent with that diagnosis,* that should end the matter. Dr. Bullis fulfilled both aspects of her duty to Jandre: (1) she was not negligent in making her diagnosis, and (2) there is no evidence that she did not fully disclose the risks and benefits of the "viable modes of treatment" for the non-negligently diagnosed condition. If we were not bound by the law as the Majority succinctly summarizes it, I would reverse. As it is, however, we must affirm. Accordingly, I respectfully concur.